**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Harvey Eugene BUTLER; Justice Vandell Hudson, a/k/a Jet, Eugene Gantt, a/k/a Tap, Anthony Renard Webb, a/k/a Ant, Ricky Jackson, a/k/a Kerry, Defendants–Appellants.**

**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Lorenzo L. HOOKS, a/k/a Peanut, Defendant–Appellant.**

**Nos. 92–6789, 92–6819.**

United States Court of Appeals, Eleventh Circuit.

Jan. 6, 1995.

---

Jimmy B. Pool, Montgomery, AL, for Harvey Eugene Butler.

Albert Agricola, Jr., Montgomery, AL, for Justice Vandell Hudson.

L. Scott Johnson, Jr., Montgomery, AL, for Eugene Gantt.

William R. King, Montgomery, AL, for Anthony Renard Webb.

Jennifer Lunt, Montgomery, AL, for Ricky Jackson.

R. Randolph Neeley, Redding Pitt, Montgomery, AL, for appellee.

Keith Ausborn, Montgomery, AL, for Lorenzo L. Hooks.

Before TJOFLAT, Chief Judge, KRAVITCH, Circuit Judge, and CLARK, Senior Circuit Judge.

TJOFLAT, Chief Judge:

Appellants Harvey Eugene Butler, Justice Vandell Hudson, Eugene Gantt, Anthony Renard Webb, Ricky Jackson, and Lorenzo L. Hooks challenge their convictions and sentences for conspiracy to distribute cocaine base, commonly known as "crack," in violation of 21 U.S.C. § 846 (1988) and related substantive offenses. Because the trial court erred in denying Gantt's motion to dismiss the indictment against him on grounds of double jeopardy, we vacate his conviction and direct the district court to enter a judgment of acquittal. We affirm the convictions of the remaining appellants, finding no merit in their claims of error.[1] We vacate their sentences, however, and remand their cases for further proceedings because the district courts' findings of fact are inadequate to permit meaningful appellate review of their sentences.

I.

A.

This case arose from a police investigation of a drug distribution ring in Montgomery, Alabama. In August 1991, the Montgomery Police Department ("MPD") and various city officials began receiving complaints that cocaine base was being sold and used in the area around 3855 April Street in Montgomery. On January 17, 1992, after conducting a preliminary investigation of the area, Detective B.J. McCullough of the MPD began a surveillance operation targeting the yard and street in front of 3855 April Street (the "April Street House"). The surveillance op-

---

1. Appellants attack their convictions on several grounds. Butler, Hudson, Webb, and Hooks assert that the evidence was insufficient to convict; Butler and Webb argue that the trial court should have suppressed certain evidence on Fourth Amendment grounds; Butler claims that the court erred in admitting into evidence his involuntary statement to the police; Webb claims that the trial court erred in admitting his prior drug conviction into evidence; Butler and Hooks argue that the trial court erred in denying their motions to sever; Webb asserts that the trial court should have granted a mistrial based on the prosecutor's inappropriate remarks in closing argument to the jury; and, similarly, Jackson urges that the court erred in denying his motion for a new trial premised upon the prosecutor's improper remarks in closing argument to the jury. We reject these claims without further discussion. Finally, we do not consider Butler's claim of ineffective assistance of counsel on this direct appeal. An ineffective assistance of counsel claim is properly raised in a collateral attack on the conviction under 28 U.S.C. § 2255 (1988). *See United States v. Griffin,* 699 F.2d 1102, 1107–08 (11th Cir.1983).

eration ran from January 17 to April 3 and involved ten controlled cocaine base buys by confidential informants and extensive video and photo surveillance. Detective McCullough videotaped the yard and street in front of the April Street House on January 17, January 25, February 1, February 4, and February 7, producing over thirteen hours of videotape. All but one of the ten controlled buys was recorded on video. A police photographer photographed drug transactions and suspects at the direction of Detective McCullough on January 25, January 31, and February 1.

The evidence obtained in the surveillance operation painted a picture of a loosely-formed drug distribution ring operating around the April Street House. Cocaine base was available for purchase around the house twenty-four hours a day, seven days a week. Generally, buyers would drive, bike, and walk into the area in front of the house and one or more street-level sellers, called "runners," would approach the buyers and sell them cocaine base. If a buyer approached in a car, runners would approach the passenger or driver-side window to conduct the sale. The runners would quickly sell the cocaine base and return to the front yard of the April Street House with the proceeds, at times openly counting their money in the yard. When runners had a surplus of cocaine base, they would compete vigorously against one another for sales, pushing and shoving to supply the buyers. Several runners kept cocaine base hidden in a tree or by the fence in the front yard of the April Street House and replenished their supply as needed. On at least two occasions, a coconspirator served as a "look-out"—sitting near the yard of the April Street House and watching the street for police. These look-outs usually worked in exchange for drugs. When police approached, the sellers would run in an effort to evade them, sometimes fleeing over the fence in the back yard of the April Street House or running across the street and through an abandoned house.

The evidence indicated that two individuals supplied cocaine base to the runners. The first was Virginia Gantt. When the cocaine base supply ran low, Virginia would leave the area for a period of time. When she returned, several runners would follow her into the April Street House. Shortly after the runners returned from the house, cocaine base would reappear for sale on the street. The second supplier, Carl Edward Hudson, operated out of the trunk of his car on the street in front of the April Street House and conducted several cocaine base transactions in this manner.

Each of the appellants was somehow involved in this distribution activity. A government witness testified that he had personally seen Harvey Eugene Butler sell cocaine base on April Street over ten times, that Butler had supplied him and others with cocaine base to sell, that he had steered buyers to Butler, and that he had seen Butler on April Street in possession of as much as an ounce of cocaine base. A second witness testified that Butler supplied him with cocaine base to sell and paid him in "rocks"—small units of the drug. Finally, Butler was apprehended on March 20 after he and Hooks approached an undercover police vehicle in an apparent attempt to make a sale. The police searched Butler and found that he possessed forty-one units of cocaine base. In a voluntary statement made pursuant to this arrest, Butler admitted that he had been selling cocaine base on April Street since January 1992 and stated that he sometimes made between $3500 and $3600 a weekend.

Justice Vandell Hudson engaged in at least eight cocaine base transactions on January 31. One of these transactions was a sale of nine units of the drug to a confidential informant. He was also videotaped engaging in four transactions on February 1 and was arrested on February 6 with nine units of cocaine base in his possession. When the police raided the April Street area on April 3 to arrest those indicted on March 31, they apprehended Hudson in the front yard of the April Street House in possession of $166 in twenty, ten, and one dollar bills.

Anthony Renard Webb was present in front of the April Street House on January 17, January 31, February 1, and February 4. On each of these occasions, he observed others selling cocaine base. A government witness testified that on one occasion he ob-

tained cocaine base from Webb to sell to a buyer and that on another occasion he accompanied Webb and Eugene Gantt to Virginia Gantt's residence, which was close to the April Street House, to "reup"—resupply the runners with drugs. When they arrived at Virginia Gantt's house, Webb entered and retrieved ten rocks of cocaine base. Webb was also arrested on March 4 for possession of cocaine base with intent to distribute.

Lorenzo L. Hooks engaged in nine transactions on January 31 and four transactions on February 1. When the police raided the area on April 3, Hooks was in the front yard of the April Street House. Eugene Gantt was in the area on several occasions, observed numerous drug transactions, including one by his juvenile son, and drove Webb to obtain drugs to resupply the runners on April Street.

Ricky Jackson was similarly involved. Virginia Gantt testified that Jackson steered buyers to her and that he worked for her as a runner between ten and twenty-five times. Another coconspirator testifying for the Government testified that Jackson sold cocaine base on April Street seven days a week from September 1991 until they were arrested by the police. Finally, video surveillance showed Jackson observing transactions on January 17 and engaging in several transactions on January 25.

#### B.

On March 31, 1992, a federal grand jury returned a twenty-six count indictment against appellants and thirteen others. The first count charged all nineteen defendants with conspiracy to distribute cocaine base. The next twenty-five counts charged various defendants with distribution and aiding and abetting distribution.[2] Police apprehended most of these defendants in early April. The court severed the defendant's cases into two groups for trial before a jury. The first trial involved Eugene Gantt and seven other defendants not before us. The jury was selected and sworn and the prosecution began presenting its case in chief on May 27. On the morning of the second day of trial, seven defendants pled guilty to substantive counts in exchange for dismissal of the other counts against them, leaving Gantt to proceed alone. The prosecution then moved for a mistrial as to Gantt, designating the motion as one for "severance, or in the alternative, mistrial." At the hearing on the motion, Gantt's counsel unequivocally and repeatedly voiced his opposition to the mistrial and clearly expressed his desire to proceed to verdict. The court granted the prosecution's motion despite these strenuous objections and ordered that Gantt be tried with the second group of defendants.

The second trial—involving Butler, Hooks, Hudson, Gantt, and Webb—began on June 1. Prior to the commencement of testimony, Gantt filed a written motion for dismissal of count one of the indictment on the ground that the second trial violated his right against double jeopardy. The court denied the motion. At the conclusion of six days of testimony, Gantt renewed his motion to dismiss, and the court once again denied it. The jury convicted each defendant of con-

---

**2.** Count three of the indictment alleged that on January 17, 1992, Webb possessed, and aided and abetted others in possessing, cocaine base with intent to distribute in violation of 21 U.S.C. § 841(a)(1) (1988) and 18 U.S.C. § 2 (1988); count eight alleged that on January 25, 1992, Jackson possessed with intent to distribute and distributed, and aided and abetted others in possessing with intent to distribute and distributing, cocaine base, all in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; count eleven alleged that on January 31, 1992, Hudson distributed 2 grams of cocaine base in violation of 21 U.S.C. § 841(a)(1); count thirteen alleged that on January 31, 1992, Hooks possessed with intent to distribute and distributed, and aided and abetted others in possessing with intent to distribute and distributing, cocaine base, all in vio-

lation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; count fifteen alleged that on February 1, 1992, Hooks and Hudson possessed with intent to distribute and distributed, and aided and abetted others in possessing with intent to distribute and distributing, cocaine base, all in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; count twenty-one alleged that on February 6, 1992, Hudson possessed 1.9 grams of cocaine base with intent to distribute in violation of 21 U.S.C. § 841(a)(1); count twenty-five alleged that on March 4, 1992, Webb possessed cocaine base with intent to distribute in violation of 21 U.S.C. § 841(a)(1); and count twenty-six alleged that on March 19, 1992, Butler possessed cocaine base with intent to distribute in violation of 21 U.S.C. § 841(a)(1). Gantt was charged only with conspiracy to distribute cocaine base.

spiracy to distribute cocaine base and found all but two of the defendants guilty of substantive counts of distributing, or aiding and abetting the distribution of, cocaine base.[3]

Because he was not apprehended in time to stand trial with the first or second group of defendants, Jackson was tried alone before another district judge on August 17. After a two-day trial, the jury found him guilty of conspiracy to distribute cocaine base and the single substantive count with which he was charged.

In sentencing the appellants, both district courts relied upon sections 1B1.3 and 2D1.1 of the United States Sentencing Guidelines. *See* United States Sentencing Commission, *Guidelines Manual* § 1B1.3 (Nov. 1, 1991) ("U.S.S.G." or "Guidelines"); *id.* § 2D1.1 (Nov. 1, 1991). In applying sections 1B1.3 and 2D1.1 to the appellants' situation, both courts determined that each appellant's offense involved over 500 grams of cocaine base and that the base offense level for each appellant was 36. *See id.* § 2D1.1(c)(4). After calculating this base offense level, applying the applicable enhancements and reductions, and determining each appellant's criminal history category, the courts sentenced the appellants to terms of imprisonment as follows: Butler to 360 months, Hudson to 210 months, Gantt to 240 months, Webb to 240 months, Jackson to 210 months, and Hooks to 235 months.

## II.

■ We first address the trial court's refusal to dismiss the indictment against Gantt on double jeopardy grounds. The court based its decision to grant the prosecution's motion for a mistrial primarily on its belief that Gantt's defense counsel needed time to interview the seven codefendants who had pled guilty on the second day of his trial and were potential government witnesses. The court relied on this justification despite the defense counsel's position that the guilty co-

defendants' testimony was *not* vital to Gantt's trial strategy:

THE COURT: Don't you need time to talk to all the people that plead guilty in that second group, wouldn't it help your Defendant appreciably if those Defendants in the second group after they plead are willing to take the stand and say your client is not a member of any conspiracy?

. . .

MR. JOHNSON: We have our misgivings about guilty parties coming and testifying on behalf of the Defendant. At the same time we might consider their testimony, but we don't rely entirely on anyone's testimony in this case.

. . . .

THE COURT: Shouldn't you interview those [defendants] and say was my client, Eugene Gantt, a member of the conspiracy to which you have pleaded or concerning which you have made a plea agreement with the United States?

MR. JOHNSON: Judge, Eugene Gantt, his defense simply does not rely on that. . . . We are prepared to go forward with the jury that's been struck for this case.

THE COURT: All right. Is there anything else you wish to bring to the Court's attention?

MR. JOHNSON: Just that we strenuously and vigorously object to a declaration of a mistrial or severance. The Defendant Eugene Gantt would be denied of his valued right to be heard by this particular tribunal. He sat prepared to be heard by this jury.

Defense counsel also assured the court that, even if he chose to interview all seven of the codefendants, he required only that evening to interview them. The court granted the prosecution's motion despite this assurance. The court primarily relied on its judgment that Gantt's counsel needed time to interview the codefendants. The court also cited judicial economy as a "secondary reason."

---

**3.** The jury found Webb not guilty of count three and, as to count twenty-five, found him guilty of the lesser included count of simple possession of cocaine base in violation of 21 U.S.C. § 844(a) (1988 & Supp. IV 1992). Gantt was convicted of

conspiracy, the only count with which he was charged. Butler, Hudson, and Hooks were convicted of all counts with which they were charged.

This court recently revisited the general principles of the Double Jeopardy Clause of the Fifth Amendment in *United States v. Chica*, 14 F.3d 1527 (11th Cir.1994).[4] *See id.* at 1530–31. Thus, we do not discuss these general principles at great length here. Jeopardy attached in Gantt's first trial when the jury was selected and sworn. *See Crist v. Bretz*, 437 U.S. 28, 35, 98 S.Ct. 2156, 2160–61, 57 L.Ed.2d 24 (1978). Because the court granted the mistrial over Gantt's objection, the Double Jeopardy Clause barred the Government from retrying him unless " 'there [was] a manifest necessity for the [mistrial], or the ends of public justice would otherwise [have been] defeated' by continuing the trial." [5] *Chica*, 14 F.3d at 1531 (quoting *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165 (1824)).

No manifest necessity was present in this case. First, Gantt's defense counsel stated that he did not think it necessary to interview the seven codefendants who had pled guilty. Second, counsel also informed the court that he could complete any interviews in one evening. Thus, the interviews could easily have been completed with virtually no interruption of the trial. Even if the court did not agree with counsel's assessment, the court could have granted a continuance to provide additional time to complete any necessary interviews. As a result, the court's concern over the defense's ability to interview Gantt's former codefendants did not create the "high degree" of necessity required to establish manifest necessity. *See Arizona v. Washington*, 434 U.S. 497, 506, 98 S.Ct. 824, 831, 54 L.Ed.2d 717 (1978). This leaves judicial economy as the trial court's sole justification for granting the mistrial. This court has held that such a reason is insufficient. *See Chica*, 14 F.3d at 1532–33.

The Government argues on appeal that the sudden departure of the seven defendants would have prejudiced the jury against Gantt and was, therefore, sufficient to necessitate a mistrial. The trial court briefly mentioned this concern during the severance hearing, but did not base its decision upon this factor. Moreover, it is clear that a cautionary instruction is normally sufficient to alleviate such prejudice. *See United States v. Carrazana*, 921 F.2d 1557, 1568 (11th Cir.) (holding that, even when a codefendant's guilty plea is revealed to the jury, instructions to the jury are sufficient to remove any prejudice to the remaining defendants), *cert. denied,* —— U.S. ——, 112 S.Ct. 191, 116 L.Ed.2d 152 (1991). The presumption that cautionary instructions are sufficient to prevent such prejudice is especially significant here. Gantt's counsel objected to a mistrial in part because Gantt's defense strategy was premised on the theory that, although others were selling cocaine base on April Street, Gantt was not. One point of this argument was that Gantt was charged with only count one of the twenty-six count indictment. The departure of the seven defendants was hardly prejudicial to him in light of this trial strategy, and the court should have respected defense counsel's right to control the course of events. *See United States v. Dinitz*, 424 U.S. 600, 609, 96 S.Ct. 1075, 1080, 47 L.Ed.2d 267 (1976) (stating that, where a judicial or prosecutorial error warranting mistrial occurs, "[t]he important consideration, for purposes of the Double Jeopardy Clause, is that the defendant retain primary control over the course to be followed in the event of such error").

Upon review, we hold that the court abused its discretion when it denied Gantt's motion to dismiss the indictment because manifest necessity did not exist when the

---

**4.** The Fifth Amendment provides that "[n]o person shall ... be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V.

**5.** The trial court repeatedly called the motion a "motion for severance or, in the alternative, mistrial," and cited several cases dealing with Rule 14 of the Federal Rules of Criminal Procedure, which governs severance. *See* Fed.R.Crim.P. 14. The court's reliance on these cases was inappro-

priate. Regardless of whether Rule 14 is the procedural vehicle a court chooses to employ in granting a mistrial, the Double Jeopardy Clause allows a defendant's case to be severed under these circumstances only if manifest necessity requires it. *See United States v. Bradley*, 905 F.2d 1482, 1488 (11th Cir.1990) ("[T]he trial court is empowered to sever after trial starts under Fed.R.Crim.P. 14 *if manifest necessity so requires.*" (emphasis added)), *cert. denied,* 498 U.S. 1089, 111 S.Ct. 969, 112 L.Ed.2d 1055 (1991).

court granted the prosecution's motion for mistrial.

## III.

Appellants Butler, Hudson, Webb, Jackson, and Hooks attack their sentences. All argue that the Guidelines sentencing provisions for crimes involving cocaine base are unconstitutional because the Guidelines' distinction between cocaine base and cocaine violates the Equal Protection Clause of the Fourteenth Amendment. In addition, they argue that the trial courts' attribution of over 500 grams of cocaine base to each of them was clearly erroneous. Finally, Butler argues that the trial court clearly erred by increasing his offense level by 2 points for obstruction of justice, and Hudson argues that the trial court erred in calculating his criminal history category.

## A.

■■■ Appellants urge that the disparity in punishment for drug crimes involving cocaine base and cocaine violates the Equal Protection Clause of the Fourteenth Amendment.[6] They argue that (1) there is no rational basis for drawing a distinction between cocaine base and cocaine under the Guidelines; and (2) the distinction's disparate impact upon blacks reveals a discriminatory motive and the distinction should, therefore, be subject to strict scrutiny. The first argument is foreclosed by this court's decision in *United States v. King*, 972 F.2d 1259 (11th Cir.1992) (per curiam). In *King*, this court held that the distinction in sentencing between cocaine base and cocaine withstands rational basis scrutiny. *Id.* at 1260. This court also recently addressed the argument that the distinction's disparate impact upon blacks requires that the distinction be subject to strict scrutiny. *See United States v. Byse*, 28 F.3d 1165, 1168–71 (11th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 767, 130 L.Ed.2d 663 (1995) (No. 94–6934). The simple allegation that the distinction disparately impacts blacks is not sufficient to require strict scrutiny under the Equal Protection Clause. *See*

*Rogers v. Lodge,* 458 U.S. 613, 617 n. 5, 102 S.Ct. 3272, 3275 n. 5, 73 L.Ed.2d 1012 (1982); *Washington v. Davis,* 426 U.S. 229, 242, 96 S.Ct. 2040, 2048–49, 48 L.Ed.2d 597 (1976). Appellants must establish that discriminatory intent played a significant role in Congress' decision to establish the distinction; the fact that Congress was aware of the possible disparate effect is not enough. *See Byse*, 28 F.3d at 1169; *see also United States v. Harden*, 37 F.3d 595, 602 (11th Cir.1994). Like the appellants in *Byse*, the appellants in this case fail to establish the existence of any discriminatory intent in Congress' action. *See Byse*, 28 F.3d at 1170. Thus, we reject their second argument as well.

## B.

■■■ Appellants also argue that the attribution of over 500 grams of cocaine base to each of them was erroneous. A trial court's determination of the quantity of drugs attributable to each defendant for purposes of sentencing is subject to reversal only if it constitutes clear error. *United States v. Robinson*, 935 F.2d 201, 205 (11th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 885, 116 L.Ed.2d 789 (1992). We conclude that there was clear error in this case because neither trial court made factual findings sufficient to support the attribution of over 500 grams of cocaine base to each appellant. We begin with a brief review of the applicable Guidelines.

### 1.

Calculating the base offense level for drug distribution requires a determination of the quantity of illegal drugs properly attributable to a defendant. *See* U.S.S.G. § 2D1.1(a)(3), (c); *id.* § 2D1.1 comment. (n. 12). This, in turn, requires an assessment of the conduct of others for which a defendant is accountable under section 1B1.3. *See id.* § 1B1.3. Section 1B1.3 of the Guidelines requires that a defendant be held responsible for all reasonably foreseeable acts of coconspirators taken in furtherance of any common plan or scheme of which the defendant's offense of conviction is a part. This requirement is

---

**6.** The Fourteenth Amendment states, in pertinent part, that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV.

established by two subsections of section 1B1.3. Subsection 1B1.3(a)(1) provides that a defendant's base offense level is determined by considering "all acts ... for which the defendant would be otherwise accountable ... or that otherwise were in furtherance of [the offense of conviction]." *Id.* § 1B1.3(a)(1). Conduct "for which the defendant 'would be otherwise accountable' ... includes conduct of others in furtherance of the execution of the jointly-undertaken criminal activity that was reasonably foreseeable by the defendant." *Id.* § 1B1.3 comment. (n. 1).[7] In this case, the relevant offenses of conviction are conspiracy to distribute cocaine base and any related substantive counts.

Complementing subsection 1B1.3(a)(1) is subsection 1B1.3(a)(2), which requires that "solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all such acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction" are attributable to the defendant for sentencing purposes. *Id.* § 1B1.3(a)(2); *see also id.* § 1B1.3 comment. (n. 2); *United States v. Wilson*, 884 F.2d 1355, 1357 (11th Cir.1989).[8] Conspiracy to distribute cocaine base is an offense for which 3D1.2(d) requires grouping of multiple counts. *See* U.S.S.G. § 3D1.2(d); *id.* § 3D1.2 comment. (n. 6).

■ Thus, the Guidelines require a district court to attribute to a defendant all drugs foreseeably distributed pursuant to a common scheme of which that defendant's offense of conviction was a part. For example, in *United States v. Andrews*, 953 F.2d 1312 (11th Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 3007, 120 L.Ed.2d 882, *and cert. denied*, — U.S. —, 112 S.Ct. 3008, 120 L.Ed.2d 882, *and cert. denied*, — U.S. —,

112 S.Ct. 3048, 120 L.Ed.2d 915 (1992), the trial court attributed 500 grams of cocaine base to four coconspirators because each defendant could have reasonably foreseen his own and his coconspirators' involvement with that amount. *See id.* at 1321–23; *see also Wilson*, 884 F.2d at 1357 (holding that evidence of shipment of over 500 grams of cocaine as part of the same common scheme or plan as the defendant's offense of conviction was sufficient to allow attribution of the 500 grams of cocaine to the defendant under the Guidelines); *cf. United States v. Munio*, 909 F.2d 436, 438–39 (11th Cir.1990) (per curiam) (holding that courts may consider conduct not contained in the indictment in sentencing a defendant), *cert. denied*, 499 U.S. 938, 111 S.Ct. 1393, 113 L.Ed.2d 449 (1991). As we discuss below, however, the trial court must make proper findings in assessing the amount of drugs attributable to each defendant.

### 2.

■ In determining the quantity of drugs attributable to a particular defendant under the Guidelines,

[T]he district court must first make individualized findings concerning the scope of criminal activity undertaken by a particular defendant. Once the extent of a defendant's participation in the conspiracy is established, the court can determine the drug quantities reasonably foreseeable in connection with that level of participation. If the court does not make individualized findings, the sentence may nevertheless be upheld if the record supports the amount of drugs attributed to a defendant.

*United States v. Ismond*, 993 F.2d 1498, 1499 (11th Cir.1993) (citations omitted); *see also United States v. Beasley*, 2 F.3d 1551, 1561 (11th Cir.1993) (quoting *Ismond*, 993 F.2d at

---

**7.** The Sentencing Commission further clarified subsection 1B1.3(a)(1) effective November 1, 1992. The clarifying amendment divided subsection 1B1.3(a)(1) into two subparts and incorporated the language of Application Note 1 into the text of subpart 1B1.3(a)(1)(B). *See* U.S.S.G. App. C amend. 439, at 312 (Nov. 1, 1994) (setting forth the clarifying amendment effective November 1, 1992). Subpart 1B1.3(a)(1)(B) now provides that a defendant's base offense level is determined by considering "all reasonably fore-

seeable acts and omissions of others in furtherance of the jointly undertaken criminal activity ... that occurred during the commission of the offense of conviction." U.S.S.G. § 1B1.3(a)(1), (1)(B) (Nov. 1, 1994).

**8.** Subsection 1B1.3(a)(2) remains essentially unchanged. *Compare* U.S.S.G. § 1B1.3(a)(2) (Nov. 1, 1991) *with id.* (Nov. 1, 1994).

1499), *cert. denied,* —— U.S. ——, 114 S.Ct. 2751, 129 L.Ed.2d 869 (1994). The amount attributable to each defendant must be established by a preponderance of the evidence. *Ismond,* 993 F.2d at 1499; *United States v. Alston,* 895 F.2d 1362, 1373 (11th Cir.1990).

 The sentencing procedures facilitate this factfinding function. The trial court "begins the guideline sentencing process by determining the circumstances of the defendant's offense conduct, the defendant's criminal history, and any other facts deemed relevant by the guidelines." *United States v. Scroggins,* 880 F.2d 1204, 1209 (11th Cir. 1989) (footnotes omitted), *cert. denied,* 494 U.S. 1083, 110 S.Ct. 1816, 108 L.Ed.2d 946 (1990). The court does so after reviewing a Presentence Report ("PSR") prepared by a probation officer. Under the Guidelines, the PSR serves a purpose similar to pretrial stipulations in a civil case: In addition to initially indicating the provisions applicable to the case at hand, the PSR facilitates the identification of factual and legal issues that remain in dispute. *United States v. Roman,* 989 F.2d 1117, 1122 n. 11 (11th Cir.1993) (en banc) (Tjoflat, C.J., concurring), *cert. denied,* —— U.S. ——, 114 S.Ct. 2139, 128 L.Ed.2d 868 (1994); *United States v. Wise,* 881 F.2d 970, 972 (11th Cir.1989). When a defendant challenges one of the factual bases of his sentence as set forth in his PSR, the burden rests with the prosecution to establish the disputed fact by a preponderance of the evidence. The trial court must then either (1) make an explicit factual finding as to the allegation; or (2) determine that no such finding is necessary because the matter controverted will not be taken into account in sentencing the defendant. Fed.R.Crim.P. 32(c)(3)(D). If the court declines to resolve a factual challenge because it is not relying on the disputed matter in determining the sentence, it must expressly set out in writing any disputed facts left unresolved. *Id.; see also Shukwit v. United States,* 973 F.2d 903, 904–05 (11th Cir.1992) (per curiam). With these standards in mind, we turn to the contents of the PSRs in this case.

### 3.

The probation officer calculated the appellants' base offense levels under the Guidelines by estimating the total amount of cocaine base distributed on April Street during each appellant's involvement in the conspiracy. The officer estimated this amount by: (1) approximating the number of cocaine base transactions that took place each day during the course of the conspiracy; (2) approximating the weight of cocaine base sold in each of those transactions; and (3) determining when each appellant became involved in the conspiracy. The probation officer then attributed a total amount of cocaine base, by weight, to each appellant by multiplying the approximate weight of the cocaine base per day by the number of transactions per day and, in turn, multiplying that number by the total number of days that a particular appellant was involved in the conspiracy.[9]

In estimating the number of cocaine base transactions per day, the probation officer relied on information provided by Detective McCullough of the MPD through the U.S. Attorney's Office. Specifically, the probation officer relied on Detective McCullough's review of the surveillance videotape chronicling the events occurring in front of the April Street House on January 17 from 10:59 a.m. to 3:07 p.m. Each PSR contained, in substantially identical form, the following statement:

Based upon the observations of the Montgomery Police Department, Narcotics and Intelligence Bureau, during the period of surveillance of the activities in the 3800 block of April Street, Montgomery, Alabama, drug sales were conducted at any time of the day, day or night, any day of the week and throughout the year. On January 17, 1992, videotaped surveillance was conducted in the vicinity of 3855 April Street. Corporal B.J. McCullough, who operated the equipment, has determined that 66 drug transactions could be seen on the videotapes. The approximate time

**9.** The probation officer's methodology is easily summarized in the following equation:
Total Amount of Cocaine Base Attributable = (Transactions per Day) × (Average Weight per Transaction) × (Number of Days in the Conspiracy).

length of the tapes from January 17, 1992 is four (4) hours.

From this information, the probation officer assumed that 66 cocaine base transactions took place on each day of the conspiracy.

In calculating the second piece of information, the average weight of a unit of cocaine base, the probation officer relied upon the prosecution's calculation of the average per-unit weight of all cocaine base either seized pursuant to the arrest of a coconspirator or purchased by confidential informants from a coconspirator during the operation.[10] The total weight of the cocaine base—47.8 grams—divided by the total number of units—236—produced an average per-unit weight of approximately 0.20 grams.

In determining the third factor, the extent of each appellant's involvement in the conspiracy, the probation officer determined the first day a particular appellant became involved in the conspiracy and considered the appellant to be involved in the conspiracy until March 31, 1992, the date the grand jury handed down the indictment. For all of the appellants except Butler, the probation officer established this first day of involvement by relying on Detective McCullough's determination of the first day that each appellant appeared on video surveillance engaging in drug-related activity. Thus, since Hudson appeared and engaged in drug-related activity on video surveillance on January 31, he was considered to be in the conspiracy as of that day. Hooks also appeared on January 31. Jackson appeared and engaged in drug-related activity on January 25; Webb on January 17. Butler did not appear on any of the videotapes, but the probation officer determined Butler's first date of involvement to be January 1 because he had acknowledged in a voluntary statement to the police that he had sold narcotics in the April Street area since January 1992. The trial court changed Butler's first day of involvement in the conspiracy to January 31 upon the recommendation of the U.S. Attorney.

Based on these three factors, then, the probation officer determined the total amount of cocaine base attributable to each appellant and used that amount to assess each appellant's base offense level. Using this method, the probation officer attributed 805.2 grams of cocaine base to Hooks, Butler, and Hudson (66 × 0.20 × 61); 976.8 grams to Webb (66 × 0.20 × 74); and 884.4 grams to Jackson (66 × 0.20 × 67). These amounts resulted in a base offense level of 36 for all appellants.

All appellants except Hooks sent the probation officer written objections to the PSR pursuant to local rule. Hooks joined in these objections at his sentencing hearing. Each objected to the method the probation officer used to calculate the amount of cocaine base attributable to him. Specifically, the appellants objected that: (1) all sales were not reasonably foreseeable by each appellant; and (2) January 17 was not a valid basis for estimating the total amount of cocaine base sold during each day of the conspiracy because January 17 was not a "typical day" on April Street.

The trial court did not hear any testimony at the sentencing hearings of Butler, Hudson, Webb, or Hooks, nor did the trial court make any findings at these hearings. The Government offered exhibits summarizing the method used to calculate the amount of cocaine base the Government contended was attributable to each appellant. These exhibits consisted of charts showing the average weight calculations, the date on which the appellants first appeared on video surveillance, and the date on which the Government asserted that the appellant became a member of the conspiracy. The Government did not, however, introduce any of the evidence on which these exhibits relied. At each hearing, the trial court overruled the appellant's objections to the Government's calculations and adopted the PSR with no exceptions.

At Jackson's sentencing hearing, the trial court heard the testimony of Detective

10. One piece of cocaine base was excluded from this calculation. On February 2, a confidential informant purchased an ounce of cocaine base from a coconspirator. This ounce was not made part of the average because the Government considered it to be much larger than the weight typically purchased by an end-user and thus did not believe it was indicative of the weight of cocaine base being sold to the buyers in front of the April Street House.

McCullough regarding the scope of the operation and Jackson's role in it. The Government offered a transcript of Virginia Gantt's trial testimony as an exhibit. The Government also offered exhibits detailing its method of calculating the amount of cocaine base attributable to Jackson. Based on this evidence, the trial court specifically found that testimony presented at both the trial and the sentencing hearing established that Jackson was a knowing and willing participant in the conspiracy from January 25, 1992 until March 31, 1992, the date of the indictment. The trial court also stated that it found the Government's method of calculating the amount of cocaine base attributable to Jackson "reasonable" and "conservative." The trial court then overruled Jackson's objection to the amount of cocaine base attributed to him and adopted the PSR.

4.

The appellants' objections to the issues of foreseeability and the Government's method of calculation of the cocaine base attributable to each appellant required that the prosecution move forward with evidence supporting its position. Further, the objections required that the district court resolve the dispute by making appropriate findings of fact.

a.

■ The trial court's finding in Jackson's sentencing hearing that Jackson became a member of the conspiracy on January 25 is not clearly erroneous. Jackson engaged in several transactions on that day. The finding that he continued as a member until the date of the indictment is also valid. This court has held that the standards for determining the extent of a defendant's participation in a common scheme or plan are essentially the same as the substantive standards required to support a conviction for conspiracy as established by the Supreme Court in *Pinkerton v. United States*, 328 U.S. 640, 646–47, 66 S.Ct. 1180, 1184, 90 L.Ed. 1489 (1946). *See United States v. Lafraugh*, 893 F.2d 314, 317 (11th Cir.), *cert. denied*, 496 U.S. 911, 110 S.Ct. 2601, 110 L.Ed.2d 281 (1990). Once a defendant becomes a coconspirator, continued participation is presumed unless the defendant can establish that he withdrew from the conspiracy. *See United States v. Finestone*, 816 F.2d 583, 589 (11th Cir.), *cert. denied*, 484 U.S. 948, 108 S.Ct. 338, 98 L.Ed.2d 365 (1987). Such a withdrawal requires taking steps inconsistent with the conspiracy and communicating these acts in a manner reasonably calculated to reach the coconspirators, or disclosing the illegal activity to law enforcement authorities. *Id.* (citing *United States v. United States Gypsum Co.*, 438 U.S. 422, 464–65, 98 S.Ct. 2864, 2887, 57 L.Ed.2d 854 (1978); *Hyde v. United States*, 225 U.S. 347, 368–69, 32 S.Ct. 793, 802–03, 56 L.Ed. 1114 (1912)). Jackson did not attempt to prove such a withdrawal.

Turning to the issue of whether the coconspirators' distribution activity was reasonably foreseeable and within the scope of Jackson's individual agreement, the trial court did not err in holding Jackson responsible for coconspirators' cocaine base transactions occurring on April Street. The transactions were executed using the same *modus operandi* that Jackson used and witnessed when he was present, *i.e.*, selling small amounts of cocaine base to buyers that approached the area on foot, by car, and by bicycle, and steering the buyers to other runners when a particular seller was out of cocaine base. It was reasonably foreseeable that this activity would continue absent intervention by law enforcement authorities. *Cf. Andrews*, 953 F.2d at 1326 (holding that the defendant could be held responsible for cocaine distributed by others as part of a conspiracy of which he was the leader).

b.

■ The issue of involvement in the conspiracy becomes more troublesome, though, when we turn to the sentencing hearings of Butler, Hudson, Webb, and Hooks. The trial court heard no testimony at their sentencing hearings and did not make any findings as to what cocaine base sales were reasonably foreseeable by each appellant. The court merely adopted the PSR. The PSR for each appellant states that the "United States contends that" the appellant was involved in the

operation on April Street a certain number of days based on certain information. A contention of the Government does not constitute a finding, particularly where a defendant objects to the conclusion that the contention is intended to support. *See Wise,* 881 F.2d at 972 ("Recitation of a party's argument is not a finding of fact...."). Nor does the fact that each defendant was convicted of conspiracy to distribute, or aid and abet the distribution of, cocaine base fully address the problem. A defendant may be found guilty of conspiracy even if he or she joined at a late date or played a limited role. *United States v. Roper,* 874 F.2d 782, 787 (11th Cir.), *cert. denied,* 493 U.S. 955, 110 S.Ct. 369, 107 L.Ed.2d 355 (1989); *see also United States v. Howard,* 895 F.2d 722, 724 (11th Cir.), *cert. denied,* 497 U.S. 1030, 110 S.Ct. 3286, 111 L.Ed.2d 794 (1990).

#### c.

As to all appellants, neither trial court made findings sufficient to support the Government's estimate of the total amount of drugs distributed on April Street. The issue of whether January 17 was a "typical" day is particularly troublesome because the amount of cocaine base attributable to each appellant is expressly premised on the 66 transactions-per-day standard, which was derived solely from the January 17 videotape. The Government did not offer any evidence at any of the sentencing hearings that tended to show that January 17, which was a Friday and thus a payday for many, was a typical or average day on April Street, or that January 17 was in any other way a valid indicator of drug activities on other days. Adoption of the PSR does not adequately respond to the appellants' objection because the PSR does not directly address this issue—all the PSR establishes is that cocaine base was available on a daily basis around the clock and that Detective McCullough counted 66 transactions on the January 17 surveillance videotape. Daily availability, however, does not establish the specific—or even the average—*volume* of cocaine base actually sold on a daily basis. Moreover, although the trial courts did make a smattering of statements, such as the court's conclusion in Webb's sentencing hearing that the "method used by the

United States is fair" or the court's statement in Jackson's hearing that the method produced "reasonable" or "conservative" results, neither court relied on, nor does our review of the record reveal, sufficient circumstantial or direct evidence that January 17 was a reliable proxy for all of the other days in the conspiracy. Such a finding is a vital prerequisite to the method that the courts adopted for sentencing.

With respect to the validity of Jackson's sentence, the Government argues that the testimony of Virginia Gantt, the primary supplier on April Street, regarding the amount of cocaine base she distributed per week supports the attribution of 884.4 grams of cocaine base to Jackson. Virginia Gantt testified at Jackson's trial, and the prosecution offered a transcript of her testimony as an exhibit at his sentencing hearing. Although Virginia Gantt's testimony may support the Government's position, in the absence of appropriate findings of fact, we cannot determine whether the trial court relied upon her testimony regarding the amount of drugs she put on the street, nor can we determine whether the court would have found her testimony on this particular point to be credible. *See United States v. Carreon,* 11 F.3d 1225, 1231 (5th Cir.1994) (remanding for findings because "[w]e are thus left to second guess the basis for the district court's calculation"). Finally, the PSR did not even mention, much less rely on, Virginia Gantt's testimony. Instead, the PSR relied on the problematic methodology already discussed.

#### d.

Because the trial courts did not make the necessary findings, we vacate the sentences of Butler, Hudson, Jackson, Webb, and Hooks, and remand for further factual findings by the trial courts. *See Ismond,* 993 F.2d at 1499. In remanding for findings, we express no opinion regarding whether the quantity originally set forth in the PSRs may ultimately be proven correct. We do require, though, that the district courts find: (1) the individual scope of involvement of Butler, Hudson, Hooks, and Webb in the conspiracy; and (2) a reliable method of quantifying the amount of drugs attributable

to each appellant. Because the absence of findings forces us to vacate the sentences and remand for resentencing, we do not address Butler's or Hudson's individual challenges to their sentences.

### IV.

For the foregoing reasons, the district courts' judgments of conviction of Butler, Hudson, Hooks, Jackson, and Webb are AFFIRMED. Their sentences, however, are VACATED and their cases are REMANDED to the district courts for further proceedings consistent with this opinion. We VACATE Gantt's conviction and direct the district court to enter a judgment of acquittal.

IT IS SO ORDERED.