**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**January 20, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

EDWARD ATENCIO and
EVA PALMA ATENCIO,

Defendants - Appellants.

Nos. 04-2325, 05-2022

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. NO. 03-1014-JC)**

David J. Pire (Phillip C. Gregory with him on the briefs), for Defendants-
Appellants.

Laura Fashing (David C. Iglesias with her on the brief), for Plaintiff-Appellee.

Before **McCONNELL**, **HOLLOWAY** and **TYMKOVICH**, Circuit Judges.

**McCONNELL**, Circuit Judge.

In December 2003, a grand jury returned a nine-count indictment against

Edward and Eva Atencio for violations of federal drug laws, transportation of

money derived from a criminal offense, and criminal forfeiture. This appeal concerns only the first seven counts.

Count 1, the most serious charge and the principal subject of this appeal, alleged that for a period of approximately 52 months from January 1999 to May 2003, the Atencios engaged in a continuing criminal enterprise under 21 U.S.C. §§ 848(b) and 848(c) through a continuing series of violations of federal drug laws involving at least 30,000 kilograms of marijuana and 150 kilograms of cocaine. Count 2 charged the Atencios, under 21 U.S.C. § 846, with conspiracy to possess with intent to distribute more than 5 kilograms of cocaine and 1,000 kilograms of marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A). Counts 3, 4, 5 and 6 charged that the Atencios had maintained four places for distribution of controlled substances in violation of 21 U.S.C. §§ 856(a)(1) and 856(b). Count 7 charged them with possession with intent to distribute more than 50 kilograms of marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).

## I. Facts and Procedural Background

At trial, the government's witnesses included three individuals who had worked as drug transporters for the Atencios. The first, Leta Quesada, transported drugs, money, and other supplies for the Atencios from October 1999 to October 2000, when she was arrested at the Mexican border carrying 200

pounds of marijuana. During that time she transported roughly 10,000 pounds of marijuana over the course of more than 50 trips to Mexico, each time driving a Mitsubishi convertible that could hold just over 200 pounds. She also participated in transactions involving 4 or 5 kilograms of cocaine. Ms. Quesada primarily took direction from Edward Atencio, although Eva Atencio attended about half of her deliveries and sometimes paid Ms. Quesada directly. She knew of at least two other drivers, a husband and wife, who worked for the organization.

The second drug transporter, Mario Duran, worked for the Atencios from early 2003 to May 2003, when he too was arrested at the Mexican border carrying 213 pounds of marijuana. All told, Mr. Duran transported just under 900 pounds of marijuana. He primarily took direction from Eva Atencio, but he referred to both Atencios as his "bosses." R. Vol. I, p. 404. After he returned empty-handed from one trip because workers in Mexico had not loaded his vehicle on time, Eva Atencio angrily phoned her father, her brother, and another man named "Popeye" in Mexico. She chastised them, complaining that the loaders "weren't doing their job, and she wasn't paying them to just slack around." R. Vol. II, p. 466. During his trips to Mexico, Mr. Duran learned of three other individuals (Debbie, Alfred, and Willie) who transported cocaine and marijuana for the Atencios, and he once watched as workers loaded about 15 boxes of cocaine into an RV for shipment.

Later, Mr. Duran cooperated with the authorities and recorded a conversation with the Atencios. During that conversation, Eva Atencio gave specific directions to Mr. Duran and acknowledged giving instructions to her father and Popeye as well.

The third drug transporter, Angela Ramirez, began working for the Atencios in 1999. She made a total of approximately 35 deliveries of marijuana to a particular house in Albuquerque, New Mexico, as well as "a couple" deliveries elsewhere. *Id.* at 599. Each trip involved less than 100 pounds of marijuana, so Ms. Ramirez transported a total of less than 3,500 pounds. She was hired by Edward Atencio, but "ordinarily" received payment from Eva Atencio.

Other witnesses at trial included Eva Atencio's uncle, Jose Del Carmelo Palma-Amaya ("Mr. Palma"), who testified that he had seen the Atencios storing 200 pounds of marijuana and 10 or 15 kilograms of cocaine. On one occasion, he had seen 25 kilograms of cocaine stored in an RV parked outside the Atencios' residence on Pajarito Road in Albuquerque (hereinafter "the Pajarito Road residence"), which was the place for distribution charged in Count 4. He knew of at least four drivers (his brother Rogelio, Carmen Romero, and Blanca Guerro and her husband Paco) who worked for the Atencios transporting drugs. He described Edward and Eva Atencio as two of the three "bosses" of the organization, and testified that each of the drivers worked "for them," by which he meant "Ed and Eva Atencio." *Id.* at 673–76.

The government also introduced, over the objection of defense counsel, the videotape deposition of Jesus Felipe Gambino Madrid, a brother-in-law of Eva Atencio. Mr. Gambino Madrid witnessed Edward Atencio's receipt of three shipments of marijuana, totaling 540 pounds.

The government submitted physical evidence, including drugs, packaging equipment, weapons and ammunition, seized from the four locations named in the indictment. Among the papers seized were drug ledgers obtained from three of those locations. One ledger, recovered from the Pajarito Road residence, documented cocaine transactions for a nine-month period from August 3, 2002 to April 29, 2003, and reflected receipts of 291 kilograms of cocaine. An expert witness, Agent Rene Medina, testified that based on the testimony of the witnesses and his review of the ledgers, extrapolating those data over the length of the conspiracy from January 1999 to May 2003, the Atencios' conspiracy involved approximately 1,891 kilograms of cocaine and a "conservative estimate" of 40,239 kilograms (88,712 pounds) of marijuana. R. Vol. II, pp. 890, 893.

In his closing argument, counsel for Edward Atencio told the jury:

This is a guy who, according to them, had a 60 million dollar operation; but yet, when he was free for 80 days, stayed around, went to court, didn't try to hide, didn't run. Does it look like a guy who had that much to lose would stay around in town?

R. Vol. III, p. 985. During the government's rebuttal, the following exchange occurred:

[Prosecutor:] [The defense] makes much of Ed Atencio being out from May 6 and through July 22. . . . Flee to Mexico?  Should he have fled to Mexico?  I want you to recall what this organization involved. . . . This was a multi-million-dollar operation.  Eva Atencio was in jail.

[Defense Counsel:] I object to that, Your Honor.

[Prosecutor:] Your Honor, Ed Atencio is supposed to go to Mexico, to Eva Palma's family, without Eva?  Where was he supposed to flee?

*Id.* at 1012–13.  The district court made no immediate ruling on the objection, although it had already instructed the jury to base its verdict "solely upon the evidence," noting that "any statements, objections, or arguments made by the lawyers are not evidence."  *Id.* at 935–36.  The district court ultimately denied Eva Atencio's motion for a mistrial on the basis of the comment.

The jury convicted both Edward and Eva Atencio on all counts.  In returning its verdict of guilty on Count 1 for a continuing criminal enterprise, the jury found that "the offense charged in Count 1 involved at least 30,000 kilograms of marijuana . . . or 150 kilograms of cocaine."  R. Vol. I, p. 111.  [Jury instruction 8D] Each of the defendants received a mandatory life sentence under Count 1, an additional life sentence under Count 2, a 240-month sentence under Counts 3–7, and a 60-month sentence for transportation of money derived from a criminal offense.  The district court ordered that the sentences should run concurrently.

On appeal, the Atencios raise several challenges to their convictions under the continuing criminal enterprise statute. They also argue that their sentences for conspiracy violate their rights under the Double Jeopardy Clause because conspiracy is a lesser included offense of a continuing criminal enterprise. They object to two aspects of the trial itself: the admission of the videotape deposition of Mr. Gambino Madrid, and the prosecutor's statement during closing arguments that "Eva Atencio is in jail." We reverse as to the separate sentence for conspiracy, as conceded by the government, and remand to the district court with instructions to vacate that sentence. As to all other issues, we affirm the judgment of the district court.

## II. Continuing Criminal Enterprise Challenges

The Atencios appeal on several grounds from their convictions under the continuing criminal enterprise ("CCE") statute, which provides in pertinent part that:

> (b) Any person who engages in a continuing criminal enterprise shall be imprisoned for life . . . if . . .
>
>> (2)(A) the violation referred to in subsection (c)(1) of this section involved at least 300 times the quantity of a substance described in subsection 841(b)(1)(B) of this title . . . .
>
> (c) . . . [A] person is engaged in a continuing criminal enterprise if--
>
>> (1) he violates any provision of this subchapter or subchapter II of this chapter the punishment for which is a felony, and

(2) such violation is a part of a continuing series of violations of this subchapter or subchapter II of this chapter–

> (A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and

> (B) from which such person obtains substantial income or resources.

21 U.S.C. § 848. The Atencios raise several challenges under the statute: (1) that the trial court violated their due process and Sixth Amendment rights by allowing the prosecution to prove that the enterprise as a whole, rather than the specific violations found by the jury beyond a reasonable doubt, "involved" the drug quantities required for a life sentence under § 848(b)(2)(A); (2) that there was insufficient evidence of those drug quantities because of flaws in the methods used by Agent Medina to extrapolate the amount of marijuana and cocaine over the length of the conspiracy; (3) that there was insufficient evidence that Eva Atencio held a position of organizer, supervisor, or manager over five or more persons under § 848(c)(2)(A); and (4) that the conspiracy charged in Count 2 is a lesser included offense of the continuing enterprise, and the Atencios' life sentences under both Counts 1 and 2 therefore violated double jeopardy.

## A. Construction of § 848(b)(2)(A)

Initially, the Atencios argue that the district court erred by confusing the relationship between the drug quantities described in § 848(b)(2)(A)[1] and the violations that make up the continuing criminal enterprise under § 848(c). Three interpretations of that relationship appear plausible. First, as the government argues, the statute might require merely that the *enterprise* as a whole "involved" either 30,000 kilograms of marijuana or 150 kilograms of cocaine. Second, as the Atencios argue, the statute might require that the *specific violations* necessary to make up the "continuing series," each of which must be agreed upon by a jury beyond a reasonable doubt under *Richardson v. United States*, 526 U.S. 813, 815 (1999), together involved an aggregate amount of marijuana or cocaine that satisfies the required quantities. Third, based on the language of § 848(b)(2)(A), the statute might require that *any one* felony violation that forms part of the series of violations must have involved the required drug quantities.

The district court apparently adopted the government's interpretation, issuing jury instructions that asked whether "the offense charged in Count 1"—that is, the continuing criminal enterprise—"involved at least 30,000

---

[1]Section 848(b)(2)(A) requires "300 times the quantity of a substance described in subsection 841(b)(1)(B)." Subsection 841(b)(1)(B) in turn lists both "100 kilograms or more of a mixture or substance containing a detectable amount of marijuana" and "500 grams or more of a mixture or substance containing a detectable amount of . . . cocaine." 21 U.S.C. §§ 841(b)(1)(B)(vii), 841(b)(1)(B)(ii)(II). Multiplying those quantities by 300 produces 30,000 kilograms of marijuana and 150 kilograms of cocaine.

kilograms of marijuana . . . or 150 kilograms of cocaine." App. Vol. I, p. 111.

The jury instructions in no way tied the drug quantities to the specific violations

found in Counts 3–7 that made up the "continuing series," and certainly did not

ask the jury to conclude that any one of the places maintained for distribution in

Counts 3–6, or the possession with intent to distribute charge in Count 7, by itself

involved the required amount of marijuana or cocaine.

The Atencios argue that because the district court misconstrued the statute,

the jury findings were not sufficient under § 848(b), and their mandatory life

sentences therefore violate due process and the Sixth Amendment. *See United*

*States v. Gaudin*, 515 U.S. 506, 509–11 (1995) (noting that due process and the

Sixth Amendment "give[] a criminal defendant the right to demand that a jury

find him guilty of all the elements of the crime with which he is charged");

*United States v. Booker*, 125 S. Ct. 738, 756 (2005) (reaffirming that facts that

increase the penalty for a crime beyond the statutory maximum must be found by

a jury).

Ordinarily, we review questions of statutory construction de novo. *Hill v.*

*SmithKline Beecham Corp.*, 393 F.3d 1111, 1117 (10th Cir. 2004). In this case,

however, as counsel conceded at oral argument, the Atencios neither raised their

challenge below nor submitted a proposed jury instruction that comported with

their interpretation of the statute.[2]  The district court therefore had no opportunity to adopt the jury instructions that the Atencios now insist were required.  *See United States v. Fabiano*, 169 F.3d 1299, 1303 (10th Cir. 1999) (requiring that, to preserve the issue for review, a challenge must "put the district court clearly on notice as to the asserted inadequacy of the jury instruction" (internal quotation marks omitted)).  Because the issue was not raised below, we review the district court's decision for plain error, and will reverse only if we find "(1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Gonzalez-Huerta*, 403 F.3d 727, 732 (10th Cir. 2005) (en banc) (internal quotation marks omitted).

Although we have not considered the relationship between the drug quantities required in § 848(b)(2)(A) and the violation described in § 848(c)(1), we have considered a similar question.  In *United States v. Almaraz*, 306 F.3d 1031, 1034–35 (10th Cir. 2002), the defendant argued that the requirement of

---

[2]The only legal challenge to the drug quantities raised by the Atencios below, was that Count 1 of the indictment charged that "the violations involved at least 30,000 kilograms of marijuana *and* 150 kilograms of cocaine," R. Vol. I, p. 36 (emphasis added), while the jury instructions allowed for a conviction based on an enterprise that "involved at least 30,000 kilograms of marijuana . . . *or* 150 kilograms of cocaine," App. Vol. I, p. 111.  The claim had no merit, however, as "[i]t is hornbook law that a crime denounced in the statute disjunctively may be alleged in an indictment in the conjunctive, and thereafter proven in the disjunctive." *United States v. Gunter*, 546 F.2d 861, 868–69 (10th Cir. 1976).

action "in concert with five or more other persons" under § 848(c)(2)(A) referred to the specific violations agreed upon by the jury under *Richardson*. We disagreed, holding that the words "undertook such violations" in § 848(c)(2)(A) in fact referred to the "continuing series of violations" in § 848(c)(2), and that the jury was not limited to the agreed-upon violations in finding that the series involved "five or more other persons." *Id.* at 1038–39.

In this case, allowing the prosecution to prove merely that the criminal enterprise as a whole "involved" 30,000 kilograms of marijuana or 150 grams of cocaine may well have been error. For that matter, the Atencios' proposed interpretation, under which the *series* of violations specifically found by the jury must involve those quantities in the aggregate, may well be erroneous. The text of § 848(b)(2)(A) refers neither to subsection (c), which defines the "continuing criminal enterprise" as a whole, nor to subsection (c)(2), which describes the "continuing series of violations." Instead, § 848(b)(2)(A) requires that "*the violation referred to in subsection (c)(1)* of this section involved" at least 30,000 kilograms of marijuana or 150 kilograms of cocaine. Subsection (c)(1) describes a single, specific violation—"he violates any provision"—on which the jury must unanimously agree. *Richardson*, 526 U.S. at 816. The violation in subsection (c)(1) also must be a felony, in apparent contrast to the other violations that make up the continuing series under subsection (c)(2). *Compare* 21 U.S.C. § 848(c)(1)

-12-

(requiring a violation of "any provision of this subchapter or subchapter II of this chapter the punishment for which is a felony"), *with* 21 U.S.C. § 848(c)(2) (requiring "a continuing series of violations of this subchapter or subchapter II of this chapter" undertaken in concert with others and from which the defendant derives substantial income). Thus, although *Almaraz* provides some support for the government's position, it is by no means controlling. Unlike the "five or more other persons" requirement, which by its language and structural subordination to § 848(c)(2) modifies the "series of violations," the drug quantity requirement in § 848(b)(2)(A) refers to "the violation" in § 848(c)(1). Based on the text of the statute, we acknowledge some doubt as to the correctness of the jury instructions in this case. *But see United States v. Singleton*, 177 F. Supp. 2d 31, 40–41 (D.D.C. 2001) (adopting the same interpretation of § 848(b)(2)(A) reflected in the jury instructions in this case).

Even if the district court's construction of the statute amounted to error that is plain, however, reversal is inappropriate on these facts because the error did not affect the Atencios' substantial rights, as required by the third prong of the plain error standard. *See Gonzalez-Huerta*, 403 F.3d at 732. Normally, a defendant "must make a specific showing of prejudice to satisfy the 'affecting substantial rights'" requirement of plain error. *United States v. Olano*, 507 U.S. 725, 735 (1993). The burden to establish prejudice lies with the party that failed

-13-

to raise its objection below. *United States v. Bradford*, 423 F.3d 1149, 1161 (10th Cir. 2005). In *Fabiano*, the defendant was convicted on charges of knowingly receiving child pornography, but the government conceded at oral argument that the jury instructions should have explicitly asked for a factual finding as to when the defendant acquired knowledge that the images depicted children. *Fabiano*, 169 F.3d at 1305. This Court assumed for the sake of argument that the instructions were erroneous, but nevertheless found no prejudice and declined to reverse the conviction because "the evidence was overwhelming" as to the defendant's guilt, even under the jury instructions proposed by the defendant. *See id.*

Given the extensive evidence, obviously credited by the jury, of the nature and scope of the Atencios' drug trafficking activities, the jury instructions now proposed by the Defendants would not have made any difference. Most damningly, the cocaine ledger seized by the government revealed receipts of 291 kilograms during a nine-month period from August 2002 to April 2003. According to the Agent Medina, extrapolating those data over the length of the conspiracy from January 1999 to May 2003, a complete set of ledgers would have reflected receipts of 1,891 kilograms of cocaine—more than ten times the 150

kilograms required under § 848(b)(2)(A).[3]  Although the jury was not specifically instructed to find that the cocaine represented in the ledger was "involved" in one of the violations charged in Counts 3–7, the jury had good reason to believe that the drugs were related to Count 4, for maintaining the Pajarito Road residence. The cocaine ledger was discovered there, and Mr. Palma testified that he had seen 25 kilograms of cocaine in an RV parked there.  On cross-examination of Agent Medina, defense counsel attempted to demonstrate that the Atencios had no involvement with cocaine whatsoever, and that their possession of chemicals used as a cutting agent for cocaine was innocent, but gave no indication that the cocaine in the ledgers in fact reflected activity from other locations.  Moreover, the quantity of cocaine calculated by the expert witness so far exceeded 150 kilograms that the jury could have decided that 92% of the cocaine had no connection to the Pajarito Road residence, while still concluding that Count 4 involved the minimum drug quantity required under the statute.  In this case, as in *Fabiano*, the jury had overwhelming evidence of the defendants' guilt, even under instructions that cured the alleged error of the district court.

---

[3]Separately, the Atencios object to the methods used by Agent Medina to calculate these drug quantities.  We address that objection in Part II.B, below.

-15-

Under these circumstances, the Atencios have not carried their burden of demonstrating that any error in the jury instructions prejudiced the result of their trial. We therefore decline to reverse their sentences for plain error.

**B. Sufficiency of the Evidence: Drug Quantities**

The Atencios also challenge the sufficiency of the evidence, under either set of jury instructions, that their conspiracy involved 30,000 kilograms of marijuana or 150 kilograms of cocaine. We review the record for sufficiency of the evidence de novo, viewing the evidence in the light most favorable to the government, and determine whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt. *United States v. Hamilton*, 413 F.3d 1138, 1143 (10th Cir. 2005). In doing so, we "neither weigh conflicting evidence nor consider the credibility of witnesses." *United States v. Darrell*, 828 F.2d 644, 647 (10th Cir. 1987). The jury "may draw reasonable inferences from direct or circumstantial evidence," but may not convict based on mere "speculation or conjecture." *United States v. Jones*, 44 F.3d 860, 865 (10th Cir. 1995). We therefore uphold convictions based on inferences that "flow[] from logical and probabilistic reasoning." *Id.*

In *United States v. Arras*, 373 F.3d 1071, 1074–75 (10th Cir. 2004), the jury returned a verdict of guilty despite the fact that the government had presented no direct evidence that the defendant had transported more than 100 kilograms of

marijuana, as required by the relevant statute.  This Court upheld the conviction, holding that the jury's inferences of total drug quantities "clearly flowed from logical and probabilistic reasoning," based on several factors: the amount of marijuana actually seized from the defendant when she was captured, the number of previous trips she had taken, and expert testimony comparing the amount she was paid for each trip with the "going rate" for marijuana.  *See id.*  Other circuits, applying the slightly less demanding "clearly erroneous" standard of review, have upheld findings of total drug quantities based on reasonable extrapolations from drug ledgers representing a brief period.  *See United States v. Young*, 39 F.3d 1561, 1572 (11th Cir. 1994) (upholding the district court's finding that a conspiracy lasting four years involved more than 1,000 kilograms of marijuana, based on drug ledgers that recorded 130 kilograms of sales over a two-month period); *United States v. Cagle*, 922 F.2d 404, 406–07 (7th Cir. 1991) (upholding the district court's finding that a conspiracy involved 3 kilograms of cocaine, based on an expert's extrapolations from a drug ledger listing definite quantities less than that amount).  On the other hand, the Eleventh Circuit in *United States v. Butler*, 41 F.3d 1435, 1444–45, 1447 (11th Cir. 1995), rejected as clearly erroneous an extrapolation, based on quantities of cocaine from a single four-hour period on a "payday" Friday afternoon videotaped by police, over the 60 to 91 days that the conspiracy lasted, noting that there was no evidence that the four-

hour period "was a typical or average day" or "was in any . . . way a valid indicator of drug activities on other days." Similarly, the Second Circuit in *United States v. Shonubi*, 998 F.2d 84, 89–90 (2d Cir. 1993), rejected the district court's calculation of the total drug quantity by simply multiplying the amount of heroin found on the defendant when he was arrested by his total number of trips to Nigeria, because the government had failed to provide "specific evidence" of the total amount of heroin—such as "drug records," "live testimony," or a "conservative estimate of [the] drug sales period and heroin seized"—and instead engaged in mere "surmise and conjecture."

Absent some extrapolation by the finder of fact, the evidence of drug quantities in this case was insufficient to support a jury verdict that the conspiracy involved 30,000 kilograms of marijuana or 150 kilograms of cocaine. The testimony at trial indicated first-hand knowledge of only 15,133 pounds (roughly 6,864 kilograms) of marijuana: 10,000 pounds transported by Ms. Quesada, 893 pounds transported by Mr. Duran, 3,500 pounds transported by Ms. Ramirez, 540 pounds observed by Mr. Gambino Madrid, and 200 pounds observed by Mr. Palma. [*See supra* Facts section] The same testimony indicated first-hand knowledge of no more than 45 kilograms of cocaine: 4 or 5 kilograms transported by Ms. Quesada and 35 or 40 kilograms observed by Mr. Palma.

The jury nonetheless had sufficient evidence to find the required drug quantities, based on the drug ledgers and reasonable extrapolations from the ledgers and other testimony presented by the government. Agent Medina's method of extrapolation was analytically comparable to the reasoning upheld in *Arras*: it was based on drug quantities actually seized, the number of trips described by witnesses, and expert analysis of documents whose contents appear, based on the "going rate" for marijuana and cocaine, to reflect drug transactions. His conclusions did not represent mere speculation or conjecture, as witnesses at trial strongly corroborated the scope of the Atencios' conspiracy, testifying that they knew of at least seven other individuals who worked as drug transporters. [*See supra*, Facts section] Viewing the record in the light most favorable to the government, we hold that the jury could have reasonably inferred, based on "logical and probabilistic reasoning," that the charged conspiracy involved at least 30,000 kilograms of marijuana or 150 kilograms of cocaine.

The Atencios challenge Agent Medina's calculations, arguing that he made various auditing errors that resulted in a 17% overstatement of the quantities reflected in the marijuana ledgers. The largest single error, however, was simply a typo referring to the wrong trial exhibit. To the extent the other purported errors turn on factual disagreements about what the ledgers represent—for example, whether certain pairs of entries double-count the same drugs, coming in

and going out—the defense raised that concern on cross-examination, and we are reluctant to substitute our own judgment for that of the jury. Regardless, even accepting all of the Atencios' criticisms at face value, a 17% reduction in Agent Medina's "conservative" estimate of 40,239 kilograms of marijuana would still yield 33,398 kilograms of marijuana, which is more than the 30,000 required to trigger a mandatory life sentence. Further, the Atencios apparently concede the accuracy of the cocaine ledger, which by itself documents 291 kilograms of cocaine trafficking, more than the 150 kilograms required to convict.

Alternatively, the Atencios challenge Agent Medina's extrapolations, making the extravagant claim that "[t]he situation at bar in this case is exactly the same as the problem in *United States v. Butler*." Aplt. Br. 33. In fact, the cases differ in several obvious ways. First, the cocaine ledger in this case captures nine months of transactions, as opposed to the mere four hours captured on videotape in *Butler*. The longer the period for which hard data are available, the more reliable any extrapolations over the length of the conspiracy. Second, the ratio between the cocaine ledger period and the duration of the conspiracy in this case is more than 1:6, an order of magnitude better than the 1:60 or 1:90 ratio at issue in *Butler*, suggesting a more reasonable inference on the part of the expert witness and the jury. Third, in *Butler* the court had good reason to believe that the Friday captured on videotape was a payday, and thus not a reliable indicator of activities

-20-

on a "typical" day. *See Butler*, 41 F.3d at 1447. In contrast, the Atencios provided no evidence at trial, and have offered no reason on appeal, that the nine months of cocaine transactions documented in the ledger were not representative of their usual cocaine trafficking activities. The Atencios' reliance on *Shonubi* is also unpersuasive because in this case, the government has provided precisely the kind of evidence it lacked in *Shonubi*: drug records, live testimony to corroborate the quantities, and estimates of the total quantities based on the drug sales period. *See Shonubi*, 998 F.2d at 89.

At bottom, the Atencios object to the act of extrapolation itself, asking this Court to hold that, as a matter of law, drug ledgers reflecting transactions during a portion of a conspiracy cannot serve as a sufficient basis for projections of drug quantities for the entire conspiracy. We decline to adopt such a rule, and find sufficient evidence in this case from which a reasonable jury, relying on "logical and probabilistic reasoning," could infer the required drug quantities.

**C. Sufficiency of the Evidence: Five or More Persons**

Next, Eva Atencio alone challenges the sufficiency of the evidence that she acted "in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management," as required by 21 U.S.C. § 848(c)(2)(A). Unlike the drug quantities discussed in § 848(b)(2)(A), the five or more persons requirement

-21-

must be proven, at most, with respect to the *series* of violations discussed in subsection (c)(2), and not with respect to the agreed-upon violations (or any one felony violation) that makes up the series. *See Almaraz*, 306 F.3d at 1038–39 (10th Cir. 2002) (analyzing dicta from *Richardson*, 526 U.S. at 823). To satisfy this requirement, a defendant need not have had regular personal contact with the five persons she supervised, managed, or organized, as "[t]he mere delegation of managerial and supervisory duties will not defeat an individual's ultimate status." *United States v. Apodaca*, 843 F.2d 421, 426 (10th Cir. 1988). The statute requires that the defendant hold a position of organizer, supervisor, or manager with respect to *persons*, which would appear to exclude a defendant who performed no duties beyond bookkeeping. *Compare* 21 U.S.C. § 848(c)(2)(A) (requiring "five or more persons with respect to whom [the defendant] occupies a position of" organizer, supervisor, or manager), *with* 21 U.S.C. § 848(b)(1) (contemplating a separate role for "principal administrator [or] organizer . . . of the enterprise"). Still, the defendant "need not be the only manager," and a co-manager of the enterprise "can be included as one of the five others with respect to whom the defendant holds a supervisory position." *Almaraz*, 306 F.3d at 1040.

The government concedes that Eva Atencio "was primarily in charge of the money." Aple. Br. 43. Her handwriting appeared in most of the drug ledgers, and she typically made payments to the drug transporters who made trips to Mexico.

Yet the government also presented evidence that Eva Atencio held a supervisory position with respect to certain co-managers and drug transporters. The recorded conversation reveals that she gave specific directions to Mr. Duran, her father, and Popeye. The angry phone call recounted by Mr. Duran suggests that she also held a supervisory position with respect to her brother and unspecified loaders in Mexico. According to Mr. Palma, four named drug transporters (Rogelio, Carmen Romero, Blanca Guerro and her husband Paco) "worked for" both Edward and Eva Atencio. R. Vol. II, pp. 673–76. Further, both Mr. Palma and Mr. Duran characterized Eva as one of the "bosses" of the organization. *Id.* at 755; R. Vol. I, p. 404. Viewed in the light most favorable to the government, the record reveals that Eva Atencio held a managerial or supervisory position with respect to at least eight individuals, and possibly many others. The jury therefore had sufficient evidence to convict under § 848(c)(2)(A).

### D. Double Jeopardy

Finally, the Atencios argue that the district court violated their rights under the Double Jeopardy Clause of the Fifth Amendment by sentencing them under both Count 1, for the continuing criminal enterprise, and Count 2, for conspiracy under 21 U.S.C. § 846. As the government concedes on appeal, the conspiracy charge against the Atencios is a lesser included offense of the continuing criminal enterprise, *Rutledge v. United States*, 517 U.S. 292, 300 (1996), and the district

court erred by imposing life sentences under both statutes. Because we affirm the Atencios' convictions under the CCE statute, we remand the case to the district court with instructions to vacate their concurrent sentences for conspiracy. We need not address the Atencios' alternative argument that the district court committed plain error in sentencing them to life for conspiracy.

### III. Trial Challenges

Two of the Atencios' challenges relate to the conduct of their trial. First, both Atencios renew their objection to the admission of the videotape deposition of Mr. Gambino Madrid. Second, Eva Atencio renews her objection to the prosecutor's statement during closing arguments that she was in jail.

### A. Videotape Deposition

We review the district court's decision to admit evidence for abuse of discretion, and we will reverse only if we find the decision "'arbitrary, capricious, whimsical, or manifestly unreasonable.'" *Black v. M & W Gear Co.*, 269 F.3d 1220, 1227 (10th Cir. 2001) (quoting *Coletti v. Cudd Pressure Control*, 165 F.3d 767, 777 (10th Cir. 1999)). Although a videotape deposition typically qualifies as hearsay under the Federal Rules of Evidence, the hearsay exception for "former testimony" includes "[t]estimony given . . . in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered . . . had an opportunity and similar motive to

-24-

develop the testimony by direct, cross, or redirect examination."  Fed. R. Evid. 804(b)(1).  The exception requires that the declarant be unavailable as a witness, which includes situations in which the declarant "is absent from the hearing and the proponent of [the] statement has been unable to procure the declarant's attendance . . . by process or other reasonable means."  Fed. R. Evid. 804(a)(5). The Confrontation Clause of the Sixth Amendment also requires that prosecutors in a criminal case make a "good-faith" effort to secure the declarant's presence at trial.  *See Barber v. Page*, 390 U.S. 719, 724–25 (1968).

Counsel for the Atencios cross-examined Mr. Gambino Madrid during his deposition, but the Atencios charge that the government neither used reasonable means to secure Mr. Gambino Madrid's testimony nor acted in good faith by allowing him to return to Mexico.  In this case, the government deported the witness to Mexico with nothing more than an address, a phone number, and a promise to return.  To the surprise of no one, the number proved invalid, calling information in Mexico turned up no leads, and Mr. Gambino Madrid failed to appear in the United States for the trial.

Even if we were to accept that the government made no good faith effort to ensure Mr. Gambino Madrid's attendance at trial, however, reversal of the Atencios' convictions is only appropriate if the error affected their substantial rights.  We may deem a constitutional error harmless only if we are "convinced

-25-

that the error was harmless beyond a reasonable doubt," *United States v. Jefferson*, 925 F.2d 1242, 1254 n.14 (10th Cir. 1991) (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)), but in this case we have no doubt that admission of the videotape deposition did not prejudice the result of the Atencios' trial.  In his deposition, Mr. Gambino Madrid stated that he witnessed Edward Atencio accept delivery of three shipments of marijuana totaling 540 pounds.  He also testified that the Atencios owned one of the residences at issue in the case, that they loaned him a blue Pontiac Sunfire, and that he observed Mr. Atencio "with a lot of cash." *See* R. Vol. I, pp. 178–84.  Compared with the tens of thousands of pounds of marijuana described by other witnesses and reflected in the drug ledgers, 540 pounds is a drop in the bucket.  Mr. Gambino Madrid's testimony also had no bearing on the quantity of cocaine, and the Atencios' large cash reserves and ownership of the residence and car were clear from other testimonial and documentary evidence.  Based on a careful examination of the record as a whole, *see United States v. Caballero*, 277 F.3d 1235, 1243 (10th Cir. 2002), we conclude that the district court's admission of Mr. Gambino Madrid's videotape deposition, even if erroneous, was harmless.

**B.  Prosecutor Remarks During Closing Arguments**

Finally, Eva Atencio renews her objection to the prosecutor's statement during closing arguments that "Eva Atencio was in jail."  That remark, according

to Mrs. Atencio, marked her as a criminal in the eyes of the jury and undermined her constitutionally protected presumption of innocence. The Supreme Court in *Estelle v. Williams*, 425 U.S. 501, 504 (1976), held that the Constitution forbids states from compelling the accused in a criminal trial from appearing before the jury, at all times, in prison clothing "because of the possible impairment of the presumption [of innocence] so basic to the adversary system." The Court in *Estelle* emphasized that the "constant reminder of the accused's condition implicit in such distinctive, identifiable attire" exerted a "continuing influence throughout the trial." *Id.* at 504–05. Requiring a defendant to wear prison clothes therefore created an "unacceptable risk" that the jury might base its decision on "impermissible factors." *Id.* at 505.

The rule of *Estelle* does not apply, however, to every "mere utterance of the words [jail, prison, or arrest]," without reference to context or circumstances. *United States v. Villabona-Garnica*, 63 F.3d 1051, 1058 (11th Cir. 1995) (internal quotation marks omitted). In *United States v. Lonedog*, 929 F.2d 568, 570–71 (10th Cir. 1991), this Court held that a prosecutor's single question at trial about the defendant's prior incarceration did not constitute plain error. Unlike the constant and continuing influence of the prison attire in *Estelle*, the effect of the lone, "isolated" reference to the defendant's prior jail time in *Lonedog* did not meaningfully impair the presumption of innocence. *See id.* Similarly, other

federal appellate courts have distinguished *Estelle* in cases involving "isolated,"

"brief," or "fleeting" references to the defendant's incarceration. *See Villabona-Garnica*, 63 F.3d at 1058 (finding a defense witness's remarks during cross-examination, which revealed the defendant's prior incarceration, "unlikely to prejudice the jury sufficiently to rise to the level of a due process violation" in part because the comments were "quite brief" and added nothing to the government's case); *cf. Maiden v. Bunnell*, 35 F.3d 477, 482–83 (9th Cir. 1994) (finding that the judge's "isolated" comment about "reluctant jurors" during voir dire did not undermine the presumption of innocence); *United States v. Jackson*, 549 F.2d 517, 527 n.9 (8th Cir. 1977) (finding no constitutional violation "where a juror's vision of a defendant in jail uniform is fleeting and outside the courtroom").

For several reasons, the prosecutor's comment that "Eva Atencio was in jail" did not impair the presumption of innocence. First, as in *Lonedog*, the comment "was an isolated, not a 'continuing,' occurrence," making the case "very different" from *Estelle*. *Lonedog*, 929 F.2d at 571. The comment not only represented a single, passing reference at the close of a full jury trial, but in context it apparently referred to ordinary *pretrial* detention, not to the fact of a

prior conviction as in *Lonedog* or to continuing detention as in *Estelle*.[4] Second, the trial court issued standard instructions admonishing the jury to base its verdict "solely upon the evidence," and emphasizing that "any statements, objections, or arguments made by the lawyers are not evidence." R. Vol. III, pp. 935–36. Such instructions help to mitigate any risk that the jury will give weight to this kind of minor, offhand remark. Third, the government has offered a benign explanation for the reference: the defense made Edward Atencio's decision not to flee the country an important part of closing arguments, when in fact Eva Atencio's imprisonment might have limited his options. Because the prosecutor's comment did not rise to the level of an unconstitutional impairment of the presumption of innocence, we affirm the decision of the district court denying her request for a mistrial.

## IV. Conclusion

We **REVERSE** the Atencios' convictions for conspiracy on Count 2, and **REMAND** this case to the district court with instructions to vacate that sentence. In all other respects, we **AFFIRM** the judgment of the district court.

---

[4]In their brief, the Atencios repeatedly misquote the statement: the prosecutor said "Eva Atencio *was* in jail," not "Eva Atencio *is* in jail." *Compare* Aplt. Br. 58–59 (emphasis added), *with* R. Vol. III, p. 1013 (emphasis added).

-29-