**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 16, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

  v.

DEMETRIUS R. HARGROVE,

     Defendant - Appellant.

No. 06-3184
(D. Kan.)
(D.C. No. 2:03-CR-20192-001-CM)

## ORDER AND JUDGMENT[*]

Before **MURPHY**, **O'BRIEN**, Circuit Judges, and **KANE**[†], District Court Judge.

Demetrius Hargrove was convicted of three counts of murder and one count of

conspiracy to kill and attempt to kill a person with the intent of preventing that person

from testifying in an official proceeding. He was spared the death penalty, but sentenced

to life imprisonment without the possibility of release. Hargrove claims the district court

---

[*] This order and judgment is an unpublished decision, not binding precedent. 10th Cir. R. 32.1(A). Citation to unpublished decisions is not prohibited. Fed. R. App. 32.1. It is appropriate as it relates to law of the case, issue preclusion and claim preclusion. Unpublished decisions may also be cited for their persuasive value. 10th Cir. R. 32.1(A). Citation to an order and judgment must be accompanied by an appropriate parenthetical notation – (unpublished). *Id.*

[†] Honorable John L. Kane, Senior District Court Judge, United States District Court for the District of Colorado, sitting by designation.

erred by: (1) not permitting sufficient inquiry into the mental status of a government witness who testified she changed her story about Hargrove's involvement in two of the murders because she was "visited" by the victims; (2) allowing the government to read into evidence the testimony of a critical, but unavailable, adverse witness taken at a state court preliminary hearing; (3) permitting questioning about and admitting into evidence a gun which could not be confirmed as the murder weapon; and (4) refusing to dismiss two counts of the indictment because the government did not properly charge the predicate offenses and constructively amending the indictment with the jury instructions. We affirm.

## I.    BACKGROUND

Hargrove and Christopher Trotter were friends[1] who engaged in myriad nefarious activities[2] including selling crack cocaine in Kansas City, Kansas. These murders were a byproduct of their drug dealing.

In February 1998 Hargrove killed one of his "customers," Elmer Berg, and Berg's sister, Misty Castor, because Berg failed to pay his drug bill. A couple of months later Hargrove and Trotter kidnapped another drug dealer, Tyrone Richards, who was talking about Hargrove's role in the Berg/Castor murders. Both were charged in federal court with the kidnapping. Trotter was in custody; Hargrove was on the lam. On July 26,

---

[1] Their friendship waned during the course of state and federal prosecutions.

[2] Among other crimes, *see infra* n.3, Trotter was convicted on July 15, 2003, in state court of two counts of murder, one count of aggravated robbery and one count of conspiracy to commit aggravated robbery (all unrelated to these murders). Trotter was sentenced to life in prison without the possibility of parole for fifty years.

1998, two days before Trotter's kidnapping trial was to begin, Hargrove killed Richards.

On January 1, 1999, an attempt was made to murder Shedrick Kimbrell, a witness to the Richards kidnapping. Hargrove arranged for the murder to be committed by Maurice Peters, Trotter's cousin.

The arrests and trials did not follow the same chronological order as the crimes. On May 11, 1998, Hargrove and Trotter were jointly charged in federal court with the Richards kidnapping, but the proceedings were severed at the government's request. Trotter was detained pending trial. After Richards, a key witness, was murdered, Trotter's trial was continued until August 1998. The jury returned a verdict of guilty on August 14, 1998. Hargrove was not arrested until November 4, 1998. On May 28, 1999, a jury convicted him of kidnapping Richards.

Hargrove was originally charged with the Berg/Castor murders in state court, where Trotter was a witness against him. Trotter testified at Hargrove's preliminary hearing on March 20, 2000.[3] The state charges were dismissed after Hargrove was indicted in this case (on December 10, 2003).

At Hargrove's trial in this case (commencing October 3, 2005), Trotter invoked his Fifth Amendment right not to testify against Hargrove. Over Hargrove's objection, the district court permitted Trotter's testimony from Hargrove's preliminary hearing in the state case to be read to the jury.

---

[3] Trotter was convicted in federal court of kidnapping Richards on August 14, 1998. On February 11, 1999, the government filed a motion to dismiss the indictment. The court granted the motion that same day. The government proceeded to trial against Hargrove in May 1999. The jury found Hargrove guilty.

A.      The Berg/Castor Murders

On February 19, 1998, at approximately 9:30 p.m., the bodies of Elmer Berg and Misty Castor were found in Berg's car in Coronado Park in Kansas City, Kansas. The car was running when the police arrived; Berg was in the driver's seat and Castor was in the passenger's seat. Both Berg and Castor had been shot twice at close range from the driver's side of the vehicle. Castor was three months pregnant at the time she was killed. There was no physical evidence tying Hargrove to their murders, but there was substantial circumstantial evidence.

Trotter's testimony against Hargrove in the state court proceedings (taken from the transcript of the preliminary hearing) was read to the jury. A summary follows. Berg owed Hargrove approximately $1500 in February 1998.[4] On the day Berg and Castor were killed, Hargrove called Trotter and told him he had a customer wanting to purchase a quarter ounce of crack. About twenty minutes later, Hargrove arrived at Trotter's house with his girlfriend, Micaela Cross Graham. Berg and Castor also drove to Trotter's house. Trotter asked Hargrove why Berg and Castor were there; Hargrove replied he had arranged to sell the crack to Berg. After Trotter asked Hargrove why he was still dealing with Berg, Hargrove said: "I'm going to knock him," which Trotter interpreted to mean Hargrove was going to kill Berg. (Joint App. at 96.)

Hargrove and Trotter drove to Coronado Park, followed by Berg and Castor in

_____

[4] Another witness, Shawn Wright, testified at Hargrove's federal trial that Berg owed Hargrove $500 to $600 at the time he was murdered. Trotter's sister, Lajoh Thomas, testified she overheard Hargrove tell Berg he owed him $150.

Berg's car. Hargrove stopped the car and stepped out carrying a .38 caliber revolver. Trotter, who remained in the car, heard four gunshots, but did not see Hargrove fire the gun. After the shots were fired, Hargrove returned to the car and drove away. Hargrove stopped near Trotter's house and threw the gun down a sewer.[5] Trotter never talked to Hargrove about what happened.

Other witnesses testified in person at Hargrove's trial. Clarence Burnett, a federal prisoner incarcerated on drug and robbery charges in the same facility where Hargrove was incarcerated, testified to the following: Hargrove "described in detail [to Burnett] how he had committed the murders" but wanted to implicate Trotter for them in revenge for Trotter's testimony against Hargrove in state court. (R. Vol. 27 at 3715.) Hargrove offered to sell information about the murders to Burnett in exchange for $40,000 or $50,000; Burnett could pass the information along to the government for his own purposes, saying it came from Trotter. Burnett agreed to the plan and Hargrove gave Burnett a series of letters he wrote, pretending to be Trotter, which described the murders in detail. Burnett read those letters to the jury.

Graham, Hargrove's girlfriend, testified that on the day of the murders, she and Hargrove drove to a gas station, Hargrove talked to Berg, and then she and Hargrove drove to Trotter's house, followed by Berg and Castor. Graham went into Trotter's house; Trotter left with Hargrove in Graham's car. Berg and Castor followed in Berg's

---

[5] The government later found a gun in the sewer system near the place Trotter mentioned, but ballistics testing revealed it was not the gun used to kill Berg and Castor. *See* discussion *infra* at Section I(B).

car.  Hargrove and Trotter returned approximately fifteen to twenty minutes later.  She overheard Hargrove and Trotter talking about going to a club in order to establish an alibi.  Hargrove went to the club, returning later that night or the next morning.  When he returned, he remarked "he didn't know why he does the things that he does sometimes" and he "just can't help himself."  (R. Vol. 30 at 4153.)  Hargrove said he felt bad for Castor, but Berg should not have brought her along.  He said Berg kept "fucking up" and should have paid his debts.  (*Id.* at 4164.)  Graham also saw Hargrove in possession of a gun wrapped in a green shirt on the day of the murders.

B.    The Richards Murder

After Berg and Castor were murdered, Tyrone Richards began telling people Hargrove had committed the murders.  Hargrove told Joshua Hunt to tell Bony (a nickname for Richards) to "keep his mouth shut."  (R. Vol. 19 at 2047.)  On April 21, 1998, Hargrove and Trotter kidnapped Richards in an effort to keep him quiet.  They drove Richards across a bridge into Missouri, but they noticed the car was low on gas so they drove back to Kansas, where they were pulled over by police.  Hargrove escaped but Trotter was arrested.[6]  Hargrove and Trotter were later charged in federal court with kidnapping Richards.  Richards was subpoenaed to testify at Trotter's trial, scheduled to begin on July 28, 1998.  On July 26, Richards was found in the back of his car with his hands and feet bound together, dead from a gunshot wound to his head.  Trotter was in custody at that time; Hargrove was not.

---

[6] The basis for Trotter's arrest is not clear from the record.

Graham testified as to her knowledge of the Richards kidnapping/murder.  On July 28, Hargrove told Graham he did not think there would be a trial in Trotter's kidnapping case.  She asked why and he said she should read the newspaper.[7]  Hargrove told her: "Bony should have kept his mouth shut."  (R. Vol. 30 at 4180.)  He later told Graham he had set up a fake drug deal to lure Richards to the location where he was murdered.

Graham said Hargrove incriminated himself in the murders of Berg, Castor and Richards on multiple occasions between July and November 1998.  On one occasion Graham told Hargrove, in reference to the murder of Berg: "[D]ead men don't pay their money."  (R. Vol. 30 at 4187.)  He responded: "[D]ead men don't talk either," which she took as a reference to the Richards murder.  (*Id.*)

Charles Williams was married to one of Trotter's sisters.  He told the jury he gave Hargrove a .38 revolver on the weekend Richards was murdered.[8]  He could not recall whether the gun was loaded but said it was probably loaded because he kept it for protection.  The government attempted to establish the gun recovered in the sewer was the loaned .38, but Williams could not say for certain they were the same.  He did testify, however, that both guns were "snub nose revolver[s], five shot with . . . wooden handle[s]."  (R. Vol. 22 at 2908.)  The sewer gun was the same size and similar weight as the loaned .38 and the insignia on the handle appeared to match that on the loaned .38.  Hargrove never returned the loaned .38 but about a week after Richards was killed,

---

[7] There was a story about Richards' murder in the newspaper.

[8] To distinguish it from the .38 used to kill Berg and Castor, we refer to this revolver as "the loaned .38."

Hargrove gave Williams a machine gun as a replacement.

The government's ballistics expert testified the bullet recovered from Richards' body could have been fired by the sewer gun, based on its general rifling characteristics. However, the bullet could also have been fired by "millions or tens of millions" of other guns. (R. Vol. 23 at 3088.) Williams had cartridges for the loaned .38. He provided one to the government, whose expert testified a bullet from the cartridges was from the same manufacturer as the bullet that killed Richards and could have been contained in the same box of ammunition, but was not manufactured on the same machine.

C.    The Kimbrell Attempted Murder

Shedrick Kimbrell, who was a witness at Trotter's kidnapping trial in August 1998, testified to the following events. He was riding in the car with Hargrove and Trotter when Richards was kidnapped. On January 1, 1999, he was accosted by a man wielding a shotgun while climbing the stairs to his house. When he heard a sound he believed to be a gun misfiring, he ran for his life. He received money from the FBI to relocate and moved away. He returned to testify at Hargrove's kidnapping trial in May 1999.

Maurice Peters, Trotter's cousin, was the man who accosted Kimbrell on January 1, 1999. He testified as follows. Hargrove asked him to kill Kimbrell and gave him a shotgun, mask, shells and gloves for that purpose. The gun did not misfire; he simply pretended he could not pull the trigger. Hargrove called Peters on January 2, 1999, to talk about the attempted murder, which they discussed in code. Hargrove asked Peters to

try again.[9]

D.    Procedural History

Hargrove was indicted for five federal crimes: premeditated murder of Elmer Berg by use of a firearm during a drug trafficking crime in violation of 18 U.S.C. §§ 924(j)(1) and 1111 (Count 1); premeditated murder of Misty Castor by use of a firearm during a drug trafficking crime in violation of 18 U.S.C. §§ 924(j)(1) and 1111 (Count 2); premeditated murder of Tyrone Richards, a federal witness, in violation of 18 U.S.C. §§ 1111 and 1512(a)(1)(A) (Count 3); aiding and abetting the attempted murder of Shedrick Kimbrell, a federal witness, in violation of 18 U.S.C. § 1512(a)(1)(A) (Count 4); and conspiracy to murder and attempt to murder Shedrick Kimbrell, a federal witness, in violation of 18 U.S.C. §§ 371, 1512(a)(1)(A) (Count 5). The government subsequently provided notice of its intent to seek the death penalty in the event of a conviction on Counts 1, 2, or 3.

Hargrove filed a motion in limine to prevent the government from reading into evidence the transcript of Trotter's testimony at the state court preliminary hearing. The court denied the motion, concluding the transcript was admissible under Rule 804(b)(1) of the Federal Rules of Evidence and its admission would not violate Hargrove's rights under the Confrontation Clause of the Sixth Amendment. At trial, the court admitted the

---

[9] Peters was charged with one count of attempting to kill a federal witness (maximum sentence of 20 years) and one count of conspiracy to kill a federal witness (maximum sentence of 5 years). He pled guilty to the conspiracy count in exchange for dismissal of the attempted murder count and agreed to cooperate with the government in this and other cases.

transcript over objection but allowed the defense to present impeachment evidence against Trotter—his 2003 murder conviction;[10] his release from the Richards kidnapping charges in exchange for his testimony against Hargrove; his receipt of $5,000 from the FBI for relocation expenses; and his supposed admission to killing Berg and Castor.[11] The court told the jury Trotter had invoked his Fifth Amendment right not to testify.

Hargrove filed another motion in limine to exclude evidence or testimony relating to the gun recovered in the sewer, arguing it was irrelevant and prejudicial because ballistics testing revealed it was not the weapon used in the Berg/Castor murders. The court denied Hargrove's motion, concluding his objection went to the weight of the evidence, not its admissibility. The evidence was also relevant to the Richards murder. At trial, the court permitted questioning about the gun and admitted it into evidence.

Hargrove moved for various forms of relief based on Graham's trial testimony. When first contacted by the police, Graham stated she was with Hargrove on the evening Berg and Castor were killed. Her testimony at Hargrove's preliminary hearing in state court (March 2000) was consistent with her original statements to the police. It was also consistent with a sworn statement she gave to Hargrove's counsel in January 2005.

Graham changed her story in a subsequent interview with FBI agents. She said, for the first time, that Hargrove told her he killed Berg and Castor. She also said

_____

[10] The jury heard about Trotter's state court conviction and sentence. *See supra* n.2.

[11] Shortly after the Berg/Castor murders, Tiffanie Stallings made a tape-recorded statement to the police, stating Trotter had confessed to her about murdering Berg and Castor. At trial, she recanted saying everything she told the police "was a lie." (R. Vol. 32 at 4597.)

- 10 -

Hargrove admitted he set up Richards with a fake drug deal, but did not admit to killing Richards. She repeated her changed story at trial and explained the change came "[b]ecause Elmer [Berg] and Misty [Castor] will not leave me alone." (R. Vol. 30 at 4222-23.) She claimed she was visited by the spirits of Berg and Castor; she denied these visitations were dreams: "If I explained it to anyone else, they would probably think they were dreams, but they're visitings." (*Id.* at 4228.) She attributed the "visitings" to her spiritual connection with Berg, derived from Berg giving her a tattoo of praying hands. On cross-examination, she acknowledged seeing a psychiatrist for an anxiety disorder and taking Klonopin, a psychotropic medication which she described as "a non-addictive form of Xanax." (*Id.* at 4306.)

The defense requested Graham produce her mental health records or submit to a psychiatric examination. She refused and the court did not require her to do either. Hargrove then asked permission to recall Graham to question her in front of the jury regarding her refusal. As an alternative, he requested the court strike her testimony. The court denied all requested relief, but allowed the defense to seek additional funds to retain "[its] own mental health person [to] testify in regards to what [Graham] has all ready [sic] testified to." (R. Vol. 31 at 4473.) The defense did not pursue that avenue of relief.

Prior to trial, Hargrove moved to dismiss Counts 1 and 2 arguing the government failed to establish a federal nexus because there was no evidence Berg and Castor were killed in the course of a drug trafficking offense or with a weapon that traveled in interstate commerce. The court denied the motion as premature. During trial, Hargrove again moved to dismiss Counts 1 and 2, arguing the indictment was fatally flawed

- 11 -

because it did not allege a drug type and quantity. The court denied the motion. At the close of the government's case, Hargrove moved for an acquittal, raising this same argument. The motion was denied. Continuing this theme, Hargrove objected to three jury instructions (Nos. 22, 23 and 25) arguing they amounted to a constructive amendment of the indictment because they referred specifically to crack cocaine, even though the indictment did not allege a drug type. The court overruled the objection.

At the close of the government's case, Hargrove moved for dismissal of Count 4 (attempted murder of Kimbrell) due to insufficient evidence. The court granted the motion.

After twenty-one days of trial and four days of deliberation, the jury returned a verdict of guilty on the four remaining counts. The government sought the death penalty, which the jury rejected.

Several months after the verdict was rendered, Hargrove moved (for the first time) to dismiss Counts 1 and 2 for lack of jurisdiction due to the government's failure to separately charge an offense under 21 U.S.C. § 841 or 18 U.S.C. § 924(c). The court denied the motion by order dated April 24, 2006.

On April 25, 2006, the court sentenced Hargrove to life imprisonment without the possibility of release on Counts 1, 2 and 3, and 60 months imprisonment on the remaining count, all to run concurrent with each other.

## II.  DISCUSSION

Hargrove summarizes his appeal issues as:

Point One—Failure to grant relief with respect to Micaela [Cross] Graham

mental illness issues.

Point Two—Failure to prohibit use of state court preliminary hearing testimony by Christopher Trotter.

Point Three—Permitting testimony about gun found in storm sewer.

Point Four—Failure to dismiss counts one and two due to inadequate pleading.

(Appellant's Opening Br. at 2-3.)  We discuss them in the order he has chosen.

A.      Graham Testimony

Hargrove requested various forms of relief after Graham changed her story because she was "visited" by the spirits of Berg and Castor, was seeing a psychiatrist because she had been diagnosed with an anxiety disorder, and was taking Klonopin, a psychotropic medication which she described as "a non-addictive form of Xanax."[12]  (R. Vol. 30 at 4306.)  The court refused all requests.  Hargrove asserts the rulings violated his Sixth Amendment right to confrontation.  The government contends the court did not violate the Sixth Amendment because mental health records are privileged and Hargrove had "an unrestricted opportunity to cross-examine [Graham]."  (Appellee's Br. at 35.) We review rulings regarding limitations on cross-examination and the striking of witness testimony for abuse of discretion.  *United States v. Rosario Fuentez*, 231 F.3d 700, 704 (10th Cir. 2000); *United States v. McKneely*, 69 F.3d 1067, 1074-75 (10th Cir. 1995).

---

[12] Though Klonopin differs from Xanax in more ways than its propensity for habit formation, Graham's statement is not entirely untrue.  Both Xanax, a trade name for Alprazolam, and Klonopin, a trade name for Clonazepam, may be prescribed for the treatment of anxiety disorders.  Klonopin is also approved for the treatment of seizure disorders.  *See* Physicians' Desktop Reference, "Drugs & Supplements: Prescription Drugs A-Z," http://www.pdrhealth.com/drugs/rx/rx-a-z.aspx (last visited June 3, 2010).

Whether a violation of the Confrontation Clause arose from evidentiary rulings is a question we review de novo. *United States v. Townley*, 472 F.3d 1267, 1271 (10th Cir. 2007).

1. *Refusal to Order Graham to Produce her Mental Health Records or Submit to Questioning Before the Jury Regarding her Refusal*

Under the Federal Rules of Evidence, "[c]ross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness." Fed. R. Evid. 611(b). "The fact of insanity or mental abnormality [of a witness] either at the time of observing the facts which he reports in his testimony, or at the time of testifying, may be provable, on cross-examination or by extrinsic evidence, as bearing on credibility." *Sinclair v. Turner*, 447 F.2d 1158, 1162 (10th Cir. 1971); *see also United States v. Sasso*, 59 F.3d 341, 347 (2d Cir. 1995) ("Evidence of a witness's psychological history may be admissible when it goes to her credibility."); *United States v. Partin*, 493 F.2d 750, 762 (5th Cir. 1974) ("It is just as reasonable that a jury be informed of a witness's mental incapacity at a time about which he proposes to testify as it would be for the jury to know that he then suffered an impairment of sight or hearing. It all goes to the ability to comprehend, know, and correctly relate the truth.").

The court did not require Graham to disclose her mental health records or submit to questioning before the jury regarding her refusal. No other meaningful limitations were placed on cross-examination.[13] Defense counsel could have questioned Graham in

---

[13] The court did not allow Hargrove to question Graham regarding the identity of her treating psychiatrist. We do not see how this meaningfully limited Hargrove's opportunity for cross-examination.

greater detail about her spiritual visitations, thus giving the jury a better opportunity to assess whether those visitations were a sign of mental illness.[14] And counsel could have questioned Graham further about her psychiatric treatment.[15] We are not persuaded that, without access to Graham's mental health records, Hargrove was unable to test whether Graham could comprehend, recall and correctly relate the truth.[16]

Hargrove has called our attention to *United States v. Robinson*, a case decided after oral argument. 583 F.3d 1265 (10th Cir. 2009). In *Robinson*, we held the defendant's rights under the Confrontation Clause were violated when the district court "prohibited [him] from questioning the prosecution's star witness on two highly relevant topics: [his] mental health and his prescription medication use."[17] *Id.* at 1274. Unlike in *Robinson*, the court here did not preclude Hargrove from inquiring into Graham's

---

[14] Graham's competency and credibility were not beyond the ken of the jury in the absence of expert testimony. A non-expert witness is competent to testify as to his observations regarding sanity, *see Diestel v. Hines*, 506 F.3d 1249, 1271 (10th Cir. 2007), and the jury can prefer lay testimony about sanity to the contrary opinion of an expert. *United States v. Coleman*, 501 F.2d 342, 346 (10th Cir. 1974). Graham's testimony about "visitings, not dreams" is so unusual that the jury would be cautious in evaluating it.

[15] Hargrove may have preferred an appeal issue to evidence that might not serve his purposes.

[16] This is especially true in light of the fact the defense failed to request funds to hire a psychiatric expert to respond to Graham's testimony despite the court's specific authorization. The defense now must argue based on speculation as opposed to testimony.

[17] The witness in *Robinson*, a confidential informant, was involuntarily committed and was diagnosed with "poly-substance abuse, mood disorder with an Axis II, temporary, for anti-social traits." *Robinson*, 583 F.3d at 1268 (quotations omitted). The Court noted it was "not a case in which a party attempts to unfairly malign a witness for distant and relatively minor mental health issues." *Id.* at 1275.

- 15 -

psychiatric history. On the contrary, the court only held Graham was not required to produce her mental health records or submit to questioning regarding her refusal. This does not violate the Confrontation Clause.

"The opinions of [the Supreme Court] show that the right to confrontation is a *trial* right, designed to prevent improper restrictions on the types of questions that defense counsel may ask during cross-examination." *Pennsylvania v. Ritchie*, 480 U.S. 39, 52 (1987). "Normally the right to confront one's accusers is satisfied if defense counsel receives wide latitude at trial to question witnesses." *Id.* at 53. "[T]he Confrontation Clause only guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Id.* (quotations omitted). Hargrove does not point to any cases which indicate the Sixth Amendment requires the government to disclose mental health records of a witness which are not in its possession. If such a right does exist, it would stem from the Due Process Clause, not the Confrontation Clause. Hargrove did not make a Fifth Amendment argument in the district court and does not rely on the Fifth Amendment in his appellate briefs. He has thus waived the issue.[18] *See Anderson v. Commerce Constr. Servs., Inc.*, 531 F.3d 1190, 1198 (10th Cir. 2008) (issue not raised in district court is

---

[18] Following oral argument, Hargrove submitted a "Rule 28j" letter to this Court citing *Robinson*, 583 F.3d 1265. *Robinson* involved both Fifth and Sixth Amendment issues. Apparently taking a cue from that discussion, Hargrove mentioned the Fifth Amendment in his letter. This is not sufficient to raise a due process challenge, particularly in light of Hargrove's statement: "In light of [Graham's] revelations, the defense, citing Mr. Hargrove's *Sixth Amendment* rights, made several requests, all of which were denied by the District Court." (Appellant's Opening Br. at 25 (emphasis added).)

waived); *Becker v. Kroll*, 494 F.3d 904, 913 n.6 (10th Cir. 2007) (issue not raised in opening brief is waived).

Where, as here, a court does not place any meaningful limitation on cross-examination, the Confrontation Clause is not violated. *See Delaware v. Fensterer*, 474 U.S. 15, 19 (1985) (holding no Sixth Amendment violation where "the trial court did not limit the scope or nature of defense counsel's cross-examination in any way"); *United States v. LaVallee*, 439 F.3d 670, 692 (10th Cir. 2006) (holding no Sixth Amendment violation where the district court denied the defendant's pre-trial motion for production of the psychiatric records of one of the government's principal witnesses because there was "no indication . . . that the [defendants] did not have the opportunity to cross-examine [the witness] effectively" and the district court "did not appear to limit the scope of questions that the defendants could ask [the witness] on cross-examination"); *United States v. Hinkle*, 37 F.3d 576, 579 (10th Cir. 1994) (holding no Sixth Amendment violation where "[t]he district court did not . . . rule out all testimony regarding the witness' mental health" and counsel "could have cross-examined the witness generally on this issue but never did so"); *see also United States v. Vitale*, 459 F.3d 190, 196 (2d Cir. 2006) (holding the district court did not err in denying defendant access to a witness' substance abuse treatment records where "the trial court did not limit the scope or nature of defense counsel's cross-examination in any way") (quotations omitted).

All we are left with, then, is the court's decision not to order Graham to submit to questioning in front of the jury regarding her refusal to provide her mental health records. "[L]imiting the scope of cross-examination is a matter well within the trial judge's

discretion and such an error will not lead to reversal unless an abuse of discretion, clearly

prejudicial to the defendant, is shown." *Rosario Fuentez*, 231 F.3d at 704 (quotations

omitted); *see also United States v. Franklin*, 82 Fed. Appx. 24, 26 (10th Cir. 2003)

(unpublished) ("[T]he decision of whether to permit . . . cross-examination of a witness

regarding his or her mental condition falls within the broad discretion of the district court

in attempting to balance possible prejudice versus probative value.").[19]  We see no abuse

of discretion here.

There is no indication Graham suffered from or was treated for a mental illness

that may have affected her perception or recall.  She testified she was diagnosed with an

anxiety disorder and had no other psychiatric diagnoses.[20]  We have not discovered a

single case in which a witness' credibility was called into question on account of an

anxiety disorder.  In *United States v. Butt*, the First Circuit noted "federal courts appear to

have found mental instability relevant to credibility only where, during the time-frame of

the events testified to, the witness exhibited a pronounced disposition to lie or

hallucinate, or suffered from a severe illness, such as schizophrenia, that dramatically

impaired her ability to perceive and tell the truth."  955 F.2d 77, 82-83 (1st Cir. 1992);

*see also United States v. Smith*, 77 F.3d 511, 516 (D.C. Cir. 1996) ("[E]vidence regarding

mental illness is relevant only when it may reasonably cast doubt on the ability or

---

[19] Unpublished decisions are not binding precedent.  10th Cir. R. 32.1(A).  We mention *Franklin* and other unpublished decisions as we would any other non-precedential authority.

[20] Defense counsel could have questioned Graham in detail about the basis for this diagnosis had he believed Graham was diagnosed with something other than an anxiety disorder.  He did not do so.

willingness of a witness to tell the truth."). We are not persuaded Graham's anxiety disorder dramatically impaired her ability to perceive and tell the truth.

In *State v. Hufford*, a case relied upon by Hargrove, the Connecticut Supreme Court held the defendant's conviction was invalid because, *inter alia*, "[t]he court erroneously denied the defendant's motion for disclosure of the complainant's psychiatric records, thereby violating the defendant's right to confront and cross-examine the state's key witness against him." 533 A.2d 866, 874 (Conn. 1987). In explaining this result, the court noted "the defendant made the requisite showing that there were reasonable grounds to believe that there were psychiatric records or information pertaining to the complainant's mental condition bearing on her testimonial capacity and reliability as a witness." *Id.* at 876. Hargrove has made no such showing here—his argument is wholly speculative. That aside, and for more important reasons, we do not consider *Hufford* persuasive: (1) the case involved the testimony of a rape victim, not just a fact witness, (2) the opinion does not mention *Pennsylvania v. Ritchie* (decided earlier that year) and reads *Davis v. Alaska*, 415 U.S. 308 (1974), more broadly than does *Ritchie*, (3) the opinion does not distinguish between due process and Sixth Amendment rights as *Ritchie* does, and (4) the opinion relies on both federal and state constitutions.

The Supreme Court has instructed: "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). In light of the

"wide latitude" afforded to trial judges, we have no trouble concluding the district court did not abuse its discretion by refusing to order Graham to submit to questioning in front of the jury regarding her refusal to provide her mental health records to the defense.

2.      *Refusal to Order Graham to Submit to a Psychiatric Examination*

A "district court has broad discretion in deciding whether to allow psychiatric examination of a government witness for purposes of impeachment." *United States v. Pino*, 827 F.2d 1429, 1430 (10th Cir. 1987). Hargrove contends the court abused its discretion by failing to order Graham to submit to a psychiatric examination.[21] We disagree.

"Before permitting a psychiatric examination, the court must consider the infringement on a witness's privacy, the opportunity for harassment, and the possibility that an examination will hamper law enforcement by deterring witnesses from coming forward." *Id.* (quotations omitted). These considerations support the district court's decision here. Ordering Graham to undergo a psychiatric examination would obviously infringe upon her privacy and would provide a potential opportunity for harassment. Moreover, if an examination were warranted solely upon a witness' admission of suffering from an anxiety disorder, one could imagine the reluctance of other witnesses with anxiety disorders or similar psychiatric conditions to testify in the future.

---

[21] It is not entirely clear Hargrove preserved this alleged error. Before the district court, defense counsel stated: "Counsel [for the government] is exactly right, you did not—you do not have the authority to order [Graham] to undergo a psychiatric evaluation. She is not a party to this case." (R. Vol. 31 at 4432.) Despite this apparent concession, the court nevertheless considered—and rejected—Hargrove's request that it order Graham to submit to a psychiatric examination.

Apart from these considerations, we can find no abuse of discretion where the jury heard Graham testify about her "visitations" as well as her psychiatric condition and thus could evaluate her credibility. *See United States v. Provenzano*, 688 F.2d 194, 203 (3d Cir. 1982) (finding no abuse of discretion in the trial judge's refusal to order a psychiatric examination of a witness where the cross-examination of the witness placed the witness's credibility in doubt and thus "provided ample information [to the jury] for its task of evaluating the truthfulness of the . . . witness[]").

3.    *Refusal to Strike Graham's Testimony*

Hargrove contends "to the extent that a witness prevents efforts at impeachment by thwarting access to his/her mental health records, the appropriate step for a Court to take is to strike the witness' testimony." (Appellant's Opening Br. at 26.) Again, we disagree.

"Striking the testimony of a witness is a drastic remedy not lightly invoked. However, striking all of the testimony of the witness may be the only appropriate remedy when refusal to answer the questions of the cross-examiner frustrates the purpose of the process." *McKneely*, 69 F.3d at 1076 (quotations omitted). Here, Graham did not refuse to answer any questions posed to her on cross-examination. She did refuse to provide her mental health records but, as discussed above, this did not significantly infringe upon Hargrove's Sixth Amendment rights and did not frustrate the purpose of his cross-examination, which could have been more reaching. The district court did not abuse its

discretion in refusing to strike Graham's testimony.[22]

B.    Use of Trotter's Preliminary Hearing Testimony

Hargrove contends his rights under the Confrontation Clause of the Sixth Amendment were violated when the court admitted the transcript of Trotter's testimony at Hargrove's state court preliminary hearing.  "Although a district court's evidentiary rulings are reviewed for abuse of discretion, whether admission of such evidence violates the Confrontation Clause is reviewed de novo."  *Townley*, 472 F.3d at 1271.

The Sixth Amendment's Confrontation Clause provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI.  In *Crawford v. Washington*, the Supreme Court held: "Where testimonial evidence is at issue . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination."  541 U.S. 36, 68 (2004).  Hargrove's arguments do not go to unavailability; he argues Trotter's testimony should have been excluded because he did not have an opportunity and similar motive to cross-examine Trotter at the state court preliminary hearing.  He claims his attorney had not completed his investigation at the time of the hearing and did not want to "tip[] his hand as to all forms of impeachment at the preliminary hearing stage." (Appellant's Opening Br. at 33.)

---

[22] The court rested its decision on Rule 601 of the Federal Rules of Evidence, finding Graham was competent to testify.  *See* Fed. R. Evid. 601 ("Every person is competent to be a witness except as otherwise provided in these rules.")  The issue here is not just whether Graham was competent to testify, but whether her testimony was credible.  Still, "we can affirm on any grounds that find support in the record."  *Colo. Flying Acad., Inc. v. United States*, 724 F.2d 871, 880 (10th Cir. 1984).

*Crawford* requires only that the defendant have an opportunity to cross-examine the adverse witness at the prior proceeding—it does not require that the defendant have a similar motive at the prior proceeding. The prior motive requirement comes from the Federal Rules of Evidence, not the Confrontation Clause. *See* Fed. R. Evid. 804(b)(1). We consider whether the admission of Trotter's testimony violated either the Confrontation Clause or the federal rules.

In *Barber v. Page*, the Supreme Court recognized "there has traditionally been an exception to the confrontation requirement where a witness is unavailable and has given testimony at previous judicial proceedings against the same defendant which was subject to cross-examination by that defendant." 390 U.S. 719, 722 (1968). "This exception has been explained as arising from necessity and has been justified on the ground that the right of cross-examination initially afforded provides substantial compliance with the purposes behind the confrontation requirement." *Id.* This exception has been applied to testimony given at a preliminary hearing, *see Crawford*, 541 U.S. at 68, despite the fact "[a] preliminary hearing is ordinarily a much less searching exploration into the merits of a case than a trial . . . because its function is the more limited one of determining whether probable cause exists to hold the accused for trial." *Barber*, 390 U.S. at 725.

Thus, in *Glenn v. Dallman*, the Sixth Circuit held the trial court did not err in admitting the preliminary hearing testimony of an unavailable witness at the defendant's subsequent trial even though the cross-examination conducted at the preliminary hearing "was narrow in scope" and "would have been conducted differently if it had been anticipated that the testimony would be introduced at the trial." 635 F.2d 1183, 1187 (6th

Cir. 1980). The court explained: "The fact remains that while petitioner's counsel did not exercise her opportunity to fully cross examine the witness, she still had that opportunity." *Id.* Hargrove likewise had an opportunity to cross-examine Trotter at the preliminary hearing and thus, the admission of Trotter's testimony did not violate the Confrontation Clause.

Hargrove also claims testimony in a Kansas state court preliminary hearing can never satisfy the requirements of the Confrontation Clause because the purpose of a preliminary hearing under Kansas law is limited to determining the existence of probable cause.[23] This argument is unavailing because the Supreme Court has held testimony from a preliminary hearing can be admitted without violating the Confrontation Clause, *see Crawford*, 541 U.S. at 68, despite the fact the function of a preliminary hearing "is . . . determining whether probable cause exists . . . ." *Barber*, 390 U.S. at 725. What matters under the Confrontation Clause is whether the defendant had a prior opportunity to cross-examine the witness. *See Crawford*, 541 U.S. at 68.[24] Under Kansas law, "[t]he defendant has the right to cross-examine witnesses against him and introduce evidence on his behalf [at the preliminary examination]." *State v. Jones*, 660 P.2d 965, 968 (Kan.

---

[23] Kansas law provides: "[E]very person charged with a felony shall have a right to a preliminary examination before a magistrate, unless such charge has been issued as a result of an indictment by a grand jury." Kan. Stat. Ann. § 22-2902(1). The statutory purpose of the preliminary hearing is to establish the existence of probable cause. *See State v. Thompkins*, 952 P.2d 1332, 1345-46 (Kan. 1998) ("The principal purpose of a preliminary examination is the determination of whether it appears that a crime has been committed and probable cause to believe the defendant committed the crime.").

[24] Hargrove also claims cross-examination at the preliminary hearing was curtailed, but we see no evidence of this in the record.

1983) (citation omitted).  Hargrove had the right and he exercised that right.

Rule 804(b)(1) of the Federal Rules of Evidence is more restrictive.  It makes admissible the prior testimony of a declarant who is unavailable as a witness at trial only "if the party against whom the testimony is now offered . . . had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination."  Fed. R. Evid. 804(b)(1).  Absent a Confrontation Clause problem, "[w]e review the district court's decision to admit evidence for abuse of discretion, and we will reverse only if we find the decision arbitrary, capricious, whimsical, or manifestly unreasonable." *United States v. Atencio*, 435 F.3d 1222, 1235 (10th Cir. 2006) (quotations omitted).

Here, the district court reviewed the transcript of Trotter's testimony at Hargrove's preliminary hearing and noted Hargrove's state court counsel "cross-examined Mr. Trotter at length . . . ."  (R. Vol. 10 at 184.)  It concluded:

> [Hargrove] had a similar motive to develop [Trotter's] testimony [at the preliminary hearing], given that he was facing the same charge, capital murder, involving the same victims, Elmer Berg and Misty Castor.  The mere fact that [Hargrove] lacked some of the tools which were later developed by the government or by [Hargrove] himself which would have allowed him to more thoroughly cross-examine Mr. Trotter does not mean that [Hargrove] lacked the opportunity to cross-examine Mr. Trotter.

(*Id.* at 184-85.)  We agree.

The fact Hargrove's counsel did not want to "tip[] his hand" does not mean he did not have a similar motive to cross-examine Trotter at the preliminary hearing. (Appellant's Opening Br. at 33.)  The Supreme Court "has never said that either the opportunity to cross-examine, or the actual cross-examination conducted at the preliminary hearing, must be as full and complete as allowed at trial in order for

- 25 -

testimony from such a proceeding to be admissible in the event the witness subsequently becomes unavailable." *United States ex rel. Haywood v. Wolff*, 658 F.2d 455, 462 (7th Cir. 1981); *see also Trigones v. Bissonnette*, 296 F.3d 1, 12 (1st Cir. 2002) (holding it was not unreasonable for the state court to conclude the defendant's motive to cross-examine a witness for bias at a suppression hearing was similar to the motive he would have had at trial; noting "the stakes at trial would have been higher, but the stakes are almost always higher then (or at least different), and it is clear that in many cases the motive at a preliminary hearing is sufficiently similar to the motive at trial to bring the evidence within the Confrontation Clause's requirements . . . ."). The court properly admitted the transcript of Trotter's preliminary hearing testimony.

C.    Admission of the Gun

The evidence demonstrated the sewer gun was not the Berg/Castor murder weapon. Moreover, there was no conclusive evidence that the sewer gun was used to kill Richards. Hargrove contends the court erred in permitting testimony about the sewer gun and admitting it into evidence because it was not relevant and was unfairly prejudicial. We review the district court's admission of evidence for abuse of discretion. *United States v. Jenkins*, 313 F.3d 549, 559 (10th Cir. 2002). We will overturn a district court's evidentiary ruling only if "it was based on a clearly erroneous finding of fact or an erroneous conclusion of law or manifests a clear error in judgment." *Id.*

The Federal Rules of Evidence define "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the

- 26 -

evidence." Fed. R. Evid. 401. "Relevancy is not an inherent characteristic of any item of evidence but exists only as a relation between an item of evidence and a matter properly provable in the case." Fed. R. Evid. 401 advisory committee's note, 1972 Proposed Rules.

> [A] fact is of consequence when its existence would provide the fact-finder with a basis for making some inference, or chain of inferences, about an issue that is necessary to a verdict. As for the degree of probative value required under Rule 401, the rule sets the bar very low. The rule establishes that even a minimal degree of probability—i.e., any tendency— that the asserted fact exists is sufficient to find the proffered evidence relevant.

*United States v. McVeigh*, 153 F.3d 1166, 1190 (10th Cir. 1998) (quotations and citations omitted).

The jury heard evidence that the sewer gun could have been used to kill Richards. And it heard evidence of some similarity between the sewer gun and the loaned .38.[25] Trotter said Hargrove threw the Berg/Castor murder weapon down the same sewer. The jury could reasonably have concluded Hargrove would dispose of the Richards murder weapon in the same place he disposed of the Berg/Castor murder weapon. The evidence was far from certain but Rule 401 requires only "a minimal degree of probability." *Id.* That standard was satisfied.

The next question is whether the evidence, though relevant, should have been excluded because "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." Fed. R. Evid. 403.

---

[25] *See* discussion *supra* at Section I(B).

"Unfair prejudice in the Rule 403 context 'means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *United States v. Tan*, 254 F.3d 1204, 1211 (10th Cir. 2001) (quoting Fed. R. Evid. 403 advisory committee's note). Evidence is unfairly prejudicial when it has the capacity "to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172, 180 (1997). In considering whether evidence is unfairly prejudicial, we may consider the availability of alternative probative evidence. *See id.* at 184-85.

The sewer gun could neither be eliminated nor confirmed as the Richards murder weapon. Even if the sewer gun was the Richards murder weapon, there was no positive evidence tying Hargrove to it—Williams could not specifically identify the sewer gun as the loaned .38. Moreover, it could not be determined whether the bullet found in Richards' body came from the same box of ammunition Williams gave to the police. But there was more and jurors are not fools.

Williams testified to significant similarities between the sewer gun and the loaned .38. He also said Hargrove did not return the loaned .38, providing a machine gun as a substitute. The jury was well aware of the limited value of the gun evidence and we can fairly assume it assigned weight accordingly.

In *United States v. Murray*, the defendant argued the court erred by admitting into evidence a sawed-off shotgun because the eyewitness to the armed robbery was not sure it was the weapon she observed. 65 F.3d 1161, 1169 (4th Cir. 1995). The court held the district court did not abuse its discretion in admitting the weapon because other evidence

"tends to make it more likely than not that the shotgun recovered was used by [the defendant] during the robbery." *Id.* at 1170. The court explained:

> Admission of a weapon into evidence is highly probative in an armed robbery conviction, whereas the prejudicial impact of its admission here is lessened by [the eyewitness's] testimony that the robber used a sawed-off weapon and by the other evidence linking [the defendants] together with the shotgun and the robbery of the credit union.

*Id.*

In *Murray*, there was some evidence connecting the weapon to the defendant and to the robbery. At the other end of the spectrum is *Walker v. United States*, 490 F.2d 683 (8th Cir. 1974). In *Walker*, the Eighth Circuit held it was prejudicial error for the district court to admit into evidence "a pistol [which was] found on the defendant at the time of his arrest but [was] demonstrably unconnected with the crime." *Id.* at 683. The court explained:

> This is not at all the classic case of admitting into evidence a "similar" weapon which was found in the possession of a defendant but which could not be positively identified as that used in a crime . . . . Here there was positive evidence that the pistol admitted was *not* similar to the one used in the crime. Thus the traditional justification for the admission of such a weapon is cut away and the evidence must be seen as irrelevant since it was not probative of the proposition that the accused committed the crime charged.

*Id.* at 684 (emphasis added) (citations omitted).

This case is more similar to *Murray* than *Walker* as there is evidence connecting Hargrove to the loaned .38 (Williams' testimony) and the sewer where a gun was found (Trotter's testimony—Hargrove threw the Berg/Castor murder weapon in the same sewer). While the government did not prove the sewer gun was the loaned .38, the gun

admitted into evidence (and testimony about it) was not "demonstrably unconnected with the crime" as was the gun in *Walker*. *See id.* at 683. As we stated in *Tan*, "[t]he district court has considerable discretion in performing the Rule 403 balancing test." 254 F.3d at 1211. The district court did not abuse its discretion.

D.      Challenge to Counts 1 and 2 of the Indictment

Count 1 charged Hargrove as follows:

> On or about the 19th day of February, 1998, in the District of Kansas, Demetrius R. Hargrove in the course of a violation of Title 18, United States Code, Section 924(c), that is, carrying and using and possessing in furtherance of and discharging a firearm during and in relation to a drug trafficking crime, that is, possession of a controlled substance with the intent to distribute, a violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, for which he may be prosecuted in a court of the United States, did unlawfully, willfully, deliberately, maliciously, and with premeditation, murder Elmer Berg with malice aforethought, through the use of a firearm, in violation of Title 18, United States Code, Sections 924(j)(1) and 1111.

(R. Vol. 1, Doc. 44.) Count 2 mirrored Count 1 except it named Misty Castor as the murder victim.

18 U.S.C. § 924(j)(1) states in pertinent part: "A person who, in the course of a violation of [18 U.S.C. § 924(c)], causes the death of a person through the use of a firearm, shall—if the killing is a murder . . . be punished by death or by imprisonment for any term of years or for life." 18 U.S.C. § 924(c)(1)(A) provides in relevant part:

> [A]ny person who, during and in relation to any crime of violence or drug trafficking crime[26] . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any

---

[26] For purposes of § 924(c), the term "drug trafficking crime" includes "any felony punishable under the Controlled Substances Act (21 U.S.C. 801 et seq.)." 18 U.S.C. § 924(c)(2).

such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime—

(i)     be sentenced to a term of imprisonment of not less than 5 years;
(ii)    if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and
(iii)   if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.

21 U.S.C. § 841(a)(1) makes it a crime to knowingly or intentionally distribute or possess with intent to distribute a controlled substance.

The jury was instructed it had to find the following five elements "beyond a reasonable doubt" to convict on Count 1:

**FIRST:**   The defendant committed a drug trafficking crime, namely, possession of a controlled substance with the intent to distribute . . . or aided and abetted in said drug trafficking crime . . . .

**SECOND:**   The defendant unlawfully used or carried a firearm during and in relation to said drug trafficking crime or possessed a firearm in furtherance of said offense;

**THIRD:**  The defendant, in the course of this offense, discharged the firearm and caused the death of Elmer Berg;

**FOURTH:**   The defendant killed Elmer Berg with malice aforethought and with premeditation; and

**FIFTH:**   The offense occurred on or about February 19, 1998, in the District of Kansas.

(R. Vol. 1, Doc. 336 at 25.)[27]  The language of the first element tracks the language of § 841 and the language of the second and third elements tracks the language of § 924(c) and § 924(j).  All of the requisite elements were set forth and supported by sufficient

_____

[27] The jury was likewise instructed as to Count 2, substituting Misty Castor in place of Elmer Berg.

- 31 -

evidence. The jury was satisfied each element was proved beyond a reasonable doubt. In spite of the government's clear proof that Hargrove violated § 924(j), § 924(c) and § 841, Hargrove contends Counts 1 and 2 should have been dismissed because the government did not separately charge the § 924(c) and § 841 offenses. He also contends the jury instructions amounted to a constructive amendment of the indictment by referencing crack cocaine, which was not specifically mentioned in the indictment. "[W]e review the sufficiency of an indictment de novo." *United States v. Barrett*, 496 F.3d 1079, 1091 (10th Cir. 2007).

1. *Failure to Separately Charge § 924(c) and § 841 Offenses*

We have held "it is unnecessary for a criminal defendant charged with a § 924(c) offense to be separately charged with and convicted of the underlying offense." *Id.* at 1094; *see also United States v. Zhou*, 428 F.3d 361, 378 n.15 (2d Cir. 2005) (noting all of the circuits to have reached the question have "rejected the argument . . . that an actual *conviction* under the predicate offense is necessary"). However, the jury must find beyond a reasonable doubt that the defendant committed the underlying (drug trafficking) offense in order to find him guilty of the § 924(c) offense. *See Barrett*, 496 F.3d at 1094; *see also United States v. McKissick*, 204 F.3d 1282, 1292 (10th Cir. 2000) ("[I]n order to establish a violation of § 924(c), the Government ha[s] the burden to prove . . . [the defendant] committed a drug trafficking crime . . . ."). Thus, had the government charged Hargrove with violating § 924(c), it would not have been necessary to separately charge the drug trafficking offense, though the government would, of course, bear the burden of

- 32 -

proving that offense beyond a reasonable doubt.[28]

But the government did not charge Hargrove with violating § 924(c). Instead, it charged him only with violating § 924(j), which permits capital punishment. Hargrove relies on *United States v. Battle*, 289 F.3d 661 (10th Cir. 2002), which, on its face, seems to support his position. In *Battle*, we rejected the defendant's argument that § 924(j) "establishes a different aggravated offense, with elements in addition to those in § 924(c)" and held § 924(j) "does not set forth a discrete crime." *Id.* at 667 (emphasis omitted). We explained § 924(j) is simply the penalty provision for a defendant who aggravates his § 924(c) offense by killing someone with a firearm in the course of committing a § 841(a) offense (or crime of violence).[29] *See id.* at 666 ("Section 924(j) describes the sentencing factors that must be proved in order to impose a consecutive sentence of death, life imprisonment or a term of years.").[30] If § 924(j) does not describe a discrete crime, then, at least arguably, it cannot be charged absent the § 924(c)

---

[28] Because the government is not required to charge the predicate offense to obtain a conviction under § 924(c), we reject Hargrove's argument that an indictment charging a violation of § 924(c) relying on § 841 as the predicate offense needs to allege drug type and quantity.

[29] *Battle* did not discuss *Apprendi v. New Jersey*, in which the Supreme Court held: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. 466, 490 (2000). Thus, we do not read *Battle*'s description of § 924(j) as a sentencing factor as bearing on the question of whether it is for the judge or jury to decide whether the defendant is eligible for an enhanced sentence under § 924(j).

[30] *See also United States v. Hatten*, No. 06-4240, 2007 WL 1977663, at *2 (4th Cir. July 5, 2007) (unpublished).

offense.[31] *See United States v. Alviso*, 152 F.3d 1195, 1199 (9th Cir. 1998) (reversing

defendant's conviction for violating 8 U.S.C. § 1326(b)(1) because that provision sets

forth a sentencing enhancement and does not state a separate offense).

But that is not the end of the matter. Before and during trial Hargrove sought to

have the indictment dismissed because it did not allege a drug type and quantity.

However, he waited until several months after his conviction—until a few days before

sentencing—to raise his § 924(c) and § 841 argument. The government "notes the

lateness of defendant's claim." (*See* Appellee's Br. at 58). But the Federal Rules of

Criminal Procedure provide that "at any time while the case is pending, the court may

hear a claim that the indictment or information fails to invoke the court's jurisdiction or

to state an offense." Fed. R. Crim. P. 12(b)(3)(B); *see also United States v. Bullock*, 914

F.2d 1413, 1414 (10th Cir. 1990) ("[T]he failure of an indictment to state an offense is a

fatal defect that may be raised at any time.") (quotations omitted). Notwithstanding Rule

12, we have recognized "the countervailing interest in judicial efficiency requires that

tardily-challenged indictments be construed in favor of validity." *United States v. Gama-*

*Bastidas*, 222 F.3d 779, 786 (10th Cir. 2000) (quotations omitted). We explained:

> If a defendant does not challenge an indictment until after a verdict . . . and
> if he does not assert prejudice, that is, if he had notice of the crime of which
> he stood accused, the indictment is to be read with maximum liberality . . . .
> Under this liberal standard, it is enough that the necessary facts appear in

---

[31] It is not uncommon for the government to allege the § 924(c) and (j) violations
in the same count of the indictment without also charging the § 924(c) offense in a
separate count. *See, e.g.*, *Barrett*, 496 F.3d at 1086; *Battle*, 289 F.3d at 662; *United
States v. Ostrander*, 411 F.3d 684, 685-86 (6th Cir. 2005); *United States v. Jackson*, 327
F.3d 273, 287-88 (4th Cir. 2003).

any form, or by a fair construction can be found within the terms of the indictment. Thus, we will find the indictment sufficient unless it is so defective that by any reasonable construction, it fails to charge the offense for which the defendant is convicted.

*Id.* (quotations and citations omitted).

In *Gama-Bastidas*, we read the challenged indictment "with maximum liberality" because the defendant did not challenge the indictment until his case was remanded for resentencing and did not contend he lacked notice of the charge against him. *See id.* at 786. We applied the same liberal standard in *United States v. Avery*, where the defendant did not challenge his indictment until after the jury had rendered its verdict. 295 F.3d 1158, 1174 (10th Cir. 2002). In both cases, we concluded the indictments were sufficient to charge the defendants with the crimes for which they were convicted. *See Gama-Bastidas*, 222 F.3d at 787; *Avery*, 295 F.3d at 1176. We apply that same liberal standard to our review of this indictment.

"[A]n indictment is considered sufficient if it sets forth the elements of the offense charged, puts the defendant on fair notice of the charges against which he must defend, and enables the defendant to assert a double jeopardy defense." *Barrett*, 496 F.3d at 1092 (quotations omitted). It is generally sufficient for the indictment to set forth an offense in the words of the statute violated so long as those words unambiguously set forth all the elements constituting the offense intended to be punished. *United States v. Doe*, 572 F.3d 1162, 1173 (10th Cir. 2009).

This indictment meets the test. Hargrove knew from the outset precisely what he was charged with (and had to defend against). The jury instructions tracked the

indictment and clearly required proof of all necessary elements. Hargrove is able to

assert a double jeopardy defense if necessary in a subsequent prosecution. The

indictment "is [not] so defective that by any reasonable construction, it fails to charge the

offense for which the defendant is convicted." *Gama-Bastidas*, 222 F.3d at 786.

On these facts, Hargrove's argument is only technical. Significantly, he makes no

claim of prejudice; he simple wants (understandably, but not justifiably) to take

advantage of an inconsequential prosecutorial error, thereby avoiding two convictions

and two life sentences. Reviewing the indictment "with maximum liberality," *see Gama-

Bastidas*, 222 F.3d at 786, we are satisfied it was sufficient to charge the offenses for

which Hargrove was convicted.

2.      *Constructive Amendment of the Indictment*

Hargrove argues the jury instructions (specifically Nos. 22, 23 and 25) amounted

to a constructive amendment of the indictment by referencing crack cocaine because the

indictment did not allege a drug type.

> A constructive amendment occurs when . . . the district court, through
> instructions to the jury, broadens the basis for a defendant's conviction
> beyond acts charged in the indictment. To constitute a constructive
> amendment, the district court proceedings must modify an essential element
> of the offense or raise the possibility the defendant was convicted of an
> offense other than that charged in the indictment.

*United States v. Tieu*, 279 F.3d 917, 921 (10th Cir. 2002) (citation omitted). "We review

de novo the legal question of whether the district court proceedings constructively

amended the indictment." *Id.* at 920.

Here, the jury instructions did not constructively amend the indictment because

- 36 -

they did not broaden the basis for Hargrove's conviction beyond acts charged in the indictment. Hargrove was charged with violating 18 U.S.C. § 924(j) by murdering Berg and Castor "in the course of" violating 18 U.S.C. § 924(c) by "carrying and using and possessing in furtherance of and discharging a firearm during and in relation to a drug trafficking crime," specifically, "possession of a controlled substance with intent to distribute" in violation of 21 U.S.C. § 841(a)(1). (R. Vol. 1, Doc. 44.) Trotter testified the controlled substance Hargrove possessed with intent to distribute was crack cocaine and the court instructed the jury that, as a matter of law, crack cocaine is a controlled substance. We see no evidence the district court modified an essential element of the offense and are convinced Hargrove was convicted of the offenses charged in the indictment.

**AFFIRMED.**

**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge